**AMERICAN CIVIL LIBERTIES UNION OF FLORIDA, INC., Greater Miami Chapter; Miami–Dade County Student Government Association, Plaintiffs,**

v.

**MIAMI–DADE COUNTY SCHOOL BOARD; Rudolph F. Crew, in his official capacity as Superintendent of Schools, Miami–Dade County Public Schools, Defendants.**

No. 06–CIV–21577.

United States District Court, S.D. Florida.

July 24, 2006.

Rosalind J. Matos, Randall C. Marshall, American Civil Liberties Union Foundation of Florida, Miami, FL, Jonel Newman, University of Miami, School of Law, Coral Gables, FL, for Plaintiffs.

Julieann Rico Allison, Miami–Dade County School Board, Enrique Daniel Arana, Jorden Burt LLP, Miami, FL, Richard J. Ovelmen, for Defendants.

### ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

GOLD, District Judge.

THIS CAUSE is before the Court upon Plaintiffs' Emergency Motion for a Temporary Restraining Order which this Court converted to a Motion for Preliminary In-

junction at a status conference held on June 27, 2006. Following the hearing on the Emergency Motion, I entered an Order establishing a briefing schedule for the parties to follow in submitting materials on the Motion for Preliminary Injunction to this Court [DE 10].

On July 7, 2006, Plaintiffs filed a Supplemental Memorandum of Law and Statement of Facts in Support of Plaintiffs' Motion for a Preliminary Injunction [DE 17 and 18]. On July 11, 2006, pursuant to this Court's requests, Plaintiffs filed a supplemental memorandum of law on organizational standing [DE 23]. Also on July 11, 2006, Plaintiffs filed a supplemental memoranda on the elements of injunctive relief. [DE 22].

On July 14, 2006, Defendants filed a Motion to Dismiss the Complaint [DE 24], and a Response to Plaintiffs' Statement of the Case and Facts [DE 25]. On July 18, 2006, Defendants filed a Memorandum of Law in Response to Plaintiffs' Memorandum on Organizational Standing [DE 29], and a Response to Plaintiffs' Supplemental Memorandum of Law on Certain Preliminary Injunction Elements [DE 30].

On July 19, 2006, Plaintiffs filed a First Amended Complaint that adds Mark Balzli, individually and as next friend to his son Aidan Balzli, as Plaintiffs [DE 39].[1] That same day, Plaintiffs also filed a Reply to Defendants' Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction [DE 38].

On July 17, 2006, I held an evidentiary hearing on Plaintiffs' Motion for Preliminary Injunction. Counsel for Plaintiffs presented testimony from Ronald Bilbao, Dr. Howard Simon, Mark Balzli, Pat Scales, Lucia M. Gonzalez, Lisandro Perez, Maria Tavel–Visiedo, and Antoinette Dun-

bar. Plaintiffs also introduced into the record as evidence their Exhibits one through thirty-six, Exhibit thirty-nine, and forty-three through forty-four. Defendants presented testimony from Alberto Pimienta, Professor Juan Clark, Lydia M. Usatequi, M.D., and Maria Elena Sardinas. Defendants also introduced into the record as evidence their Exhibits A through D, with accompanying sub-exhibits, and Exhibits A through D as attached to the Affidavit of Maria Elena Sardina.

## I. PARTIES

There are four named Plaintiffs in this case as stated in the First Amended Complaint for Declaratory and Injunctive Relief. The first is the American Civil Liberties Union of Florida, Inc., Greater Miami Chapter (the "ACLU"). The ACLU is the Florida affiliate of the American Civil Liberties Union, and defines itself as an organization "dedicated to advancing and preserving the constitutional protections found in the Bill of Rights, and in particular, the First Amendment." (Plaintiffs' Exhibit 26, Declaration of Dr. Howard L. Simon, ¶ 2). Its membership numbers approximately 3,500 people within the Miami–Dade County School District (the "School District"), a number of whom have children who attend school in Miami–Dade County and wish to retain the challenged book within the school libraries. (*Id.* at ¶ 8). The second Plaintiff in this case is the Miami–Dade County Student Government Association (the "Association"), a student-run organization representing the opinions and concerns of students attending Miami–Dade County Public Schools. (Plaintiffs' Exhibit 24, Declaration of Ronald Bilbao, ¶ 3). Among other goals, the Association devotes resources to protecting and defending the First Amendment

1. As explained in Section III, *infra,* Plaintiffs' First Amended Complaint is proper because

Defendants have not yet filed a responsive pleading in this case. Fed.R.Civ.P. 15(a).

rights of its student body, including the right to "freely select a wide range of reading materials." (*Id.*). The Third Plaintiff is Mark Balzli. Mr. Balzli seeks relief both individually and as next friend of his son, Aidan Balzli, the fourth Plaintiff. Mr. Balzli is currently a member of the ACLU. (Plaintiffs' Exhibit 27, Declaration of Mark Balzli, "Balzli Declaration," ¶ 1). Mr. Balzli's six year-old son, Aidan, attends North Beach Elementary School, a school in the School District. (*Id.* at ¶ 2). Until recently, *¡Vamos a Cuba!* was part of the library collection at North Beach Elementary School. (*Id.* at ¶ 3). Mr. Balzli desires to check the book out to read it with his son. (*Id.*).[2]

There are two named Defendants in this lawsuit. The Miami–Dade County School Board (the "School Board") is responsible for establishing, organizing, and operating public schools within Miami–Dade County. (Amend.Compl., ¶ 8).[3] The School Board operates within the Miami–Dade County School District (the "School District"), a geographical region that embodies all of Miami–Dade County. Defendant Rudolph F. Crew is the Superintendent of Schools for Miami–Dade County (the "Superintendent"). (*Id.* at ¶ 9). He is named as a Defendant in this lawsuit because it is his responsibility to carry out School Board orders, including the order that is the subject of this case. (*Id.*).

2. There was an issue of fact at the preliminary injunction hearing as to whether Mr. Balzli and his son had seen *¡Vamos a Cuba!* at the North Beach Elementary School library. I hereby credit Mr. Balzli's testimony that he had see the book.

3. Although I glean these facts from the Amended Complaint, they do not appear to be in dispute.

4. The Cuba Books' content explores Cuba, Land, Landmarks, Homes, Food, Clothes, Work, Transportation, Language, School, Free Time, Celebrations, and the Arts, as fol-

Plaintiffs seek injunctive relief to enjoin Defendants from executing an order entered by the School Board authorizing the removal of a series of books from school libraries within the School District. I will now turn to the history that preceded the filing of this case.

## II. FACTS

### A. The Cuba Books and the Complaint

On April 4, 2006, a parent of a student attending Marjory Stoneman Douglas Elementary School filed a formal complaint pursuant to School Board Rule 6Gx13–6A–1.26 (the "School Board Rule") requesting that *¡Vamos a Cuba!* (the "Book," or together with its English counterpart, *A Visit to Cuba*, the "Cuba Books") be removed from the "total school environment" at Marjory Stoneman Douglas Elementary School. (Plaintiffs' Exhibit 32, Citizen's Request for Reconsideration of Media). In response to the complaint form question, "To what do you object? *(Please be specific; cite pages or sections.),*" the parent responded: "The contents and photographs of the book." (*Id.*). In response to the complaint form question, "Why do you object to this material?", the parent responded: "As a former political prisoner from Cuba, I find the material to be untruthful. It portrays a life in Cuba that does not exist." (*Id.*).[4]

lows: (1) Cuba-"Cuba is a country in the Caribbean Sea, south of Florida. It is one big island with some smaller ones nearby. People in Cuba eat, work, and go to school like you do. Life in Cuba is also unique." (2) Land-"Cuba has flat plains that are used for farmland. There are also sandy beaches and coral reefs. The weather in Cuba is very warm. There are mountains in Cuba, too. The mountains are covered with forests." (3) Landmarks-"The capital of Cuba is Havana. The Capitol building in Havana looks like the United States Capitol building in Washington, D.C. Morrow Castle is an old fort. It was

The School Board Rule prescribes a list of 15 criteria for teachers, library media specialists, and administrators to apply in evaluating library materials. (Plaintiffs' Exhibit 11). Some of those criteria include educational significance, appropriateness (to age, maturity, interest and learning levels), and accuracy. (*Id.*). These guidelines help library specialists to develop a "comprehensive collection" of materials "in all areas of knowledge." (*Id.*).

The School Board Rule also prescribes certain procedures to be followed whenever a citizen complains about a library book. (*Id.*). Specifically, the School Board Rule provides an initial, school level review of the complaint, followed by a district level review, and finally, a review before the School Board itself. (*Id.*).

The books about which Mr. Amador complained, the Cuba Books, are picture books in a larger series of books called the "A Visit To" series published by Heinemann Library (the "Series"). (Plaintiffs' Exhibit 35). The "A Visit To" series targets readers between the ages of 4 to 8 years old, and are written to provide basic information about what life is like for a child in twenty countries. The English language series—of which A Visit to Cuba is part—covers twenty countries: Australia, Brazil, Cambodia, China, Colombia, Costa Rica, Cuba, Egypt, France, Germany, Greece, India, Ireland, Israel, Italy, Japan, Mexico, Puerto Rico, The United

built by people from Spain. It was used 400 years ago to protect Havana from pirates." (4) Homes-"Most Cubans live in cities. The cities are crowded, so many live in apartment buildings. There are some beautiful old buildings. There are new buildings, too. Most homes in the country are simple. Some are made of wood from palm trees. They have roofs of palm leaves or grasses." (5) Food-"White rice is the most common food in Cuba. Sometimes it is mixed with black beans. Chicken with rice is popular, too. Many kinds of fruits grow in Cuba. Bananas, pineapples, oranges, and mangoes are favorites. Yucca is a plant that people eat as a vegetable." (6) Clothes-"Cubans dress to keep cool in the hot weather. Many children wear shorts and T-shirts. For special festivals, men wear white pants and white shirts. Women wear colorful ruffled dresses." (7) Work-"Some Cubans work in factories that make cigars or sugar. There are also factories where people make cloth, shoes, paper, and farm tools. In the country, there are large farms. The workers there grow sugarcane and tobacco. There are also farms for vegetables, such as lettuce, onions, and carrots." (8) Transportation-"There are not many cars in Cuba. In the cities, some people drive old cars from the United States. Most Cubans travel by bus. On country roads, people use animals to pull wagons. Animals are also used to help farmers in their fields." (9) Language-"Most people in Cuba speak Spanish. This is because Cuba was settled by people from Spain. Spanish uses some of the same letters as English. There are also some extra letters in the Spanish alphabet." (10) School-"Cuban children go to school between the ages of five and fourteen. They wear uniforms to school. There are different colored uniforms for different ages. In school, children learn math, reading, and history. All school children do some kind of work during their school day. Some children work in gardens. Older children may work in factories." (11) Free Time-"Baseball is Cuba's national sport. Cuba won the gold medal in baseball in the 1996 Olympic Games. Cuba's beaches are good for swimming and boating. People like to dive and fish. There are also rowboats and sailboat races." (12) Celebrations-"Cuba's biggest celebration is called Carnival. It is held on July 26. People dance and sing at this festival. Some people who settled in Cuba were Roman Catholics. Other people who lived in Cuba were from Africa. So some Cuban celebrations mix African and Catholic beliefs." (13) The Arts-"Cuban music mixes sounds from Africa and Spain. Musicians use guitars, drums, and gourds to make music and a beat. Dances from Cuba are popular around the world. In one valley in Cuba, there are large, colorful paintings on some rocks. Inside the rocks are caves. The caves have paintings made by people who lived in Cuba about 1,000 years ago." The large-prints texts are accompanied by color photographs. A short list of facts, translations and a bibliography is appended.

Kingdom, and Vietnam. (*Id.*).[5] The Spanish language series, of which *¡Vamos a Cuba!* is part, covers four countries: Columbia, Cuba, Costa Rica and Puerto Rico. (*Id.*).

According to Plaintiffs' Exhibit 17, there are currently 49 copies of the book *¡Vamos a Cuba!*, or its English counterpart, in 33 public elementary and middle schools in the School District.[6] Five of those schools are middle schools. (*Id.*). Marjory Stoneman Douglas Elementary, where Mr. Amador's son attended school, had purchased three copies of the Cuba Books. (*Id.*). Copies of the Cuba Books were obtained by the schools at different times between the years 2001 and 2006. (*Id.*).[7] According to the undisputed testimony at the evidentiary hearing, students attending any of those schools may obtain a copy of either book at their leisure, and students and their parents at any other public school within the School District may check out the book through the inter-library system loan program. Moreover, parents may visit school libraries with their children both before and after school hours at any time throughout the school year to locate and check-out books for recreational reading.

## B. Review Process

### 1. School Level Review

In response to Mr. Amador's complaint, the School Board convened a School Materials Review Committee ("SMRC") to review the matter. (Plaintiffs' Exhibit 10, Memo dated April 21, 2006 to Dr. Manuel C. Barreiro, Principal of Marjory Stoneman Douglas Elementary from Mrs. Janet S. Hupp, Regional Superintendent Regional Center V Operations). Represented on the SMRC were eight individuals, including elementary school educators, librarians, administrators, a representative of the parent teacher student group and the designee of the Regional Center V Superintendent. (*Id.*). The SMRC met on April 17, 2006 and reviewed Mr. Amador's complaint, the School Board Rule, (particularly the 15 evaluative criteria set forth in Section IV of the Rule), a rubric, or worksheet, to aid in their assessment of the 15 criteria, and the challenged Book.[8] (*Id.*).

---

5. Pursuant to this Court's request, Defendants filed copies of all twenty books, and I hereby refer to the collection of books as Court's Exhibit 1.

6. One hundred and fifty-nine copies of the Cuba Books are currently found in school districts across the state of Florida. (Plaintiffs' Exhibit 18, Notes and Reviews for the book *¡Vamos a Cuba!* ).

7. At the evidentiary hearing, Plaintiffs submitted Exhibit 44 identifying with more particularity the location of copies of the Cuba Books in the Miami–Dade Public School System. From this revised list, there are even copies of the Cuba Books in several senior high schools.

8. The SMRC considered a number of reviews on the Cuba Books. Below is a list of the review titles and their comments on the Cuba Books:

- *Criticas* (July 1, 2004) (Monthly online magazine with reviews of Spanish language books): PS–GR 3–Each of these four large-print, easy-to-read books on Latin American countries offers basic facts about each country's food, clothing, work, languages, points of interest, festivals, and arts. All contain a page of important facts and a list of Spanish words that are peculiar to the region, along with their English meanings. A good beginning reader choice for school and public libraries, and for childcare centers with large Latino populations. Copyright 2004 Reed Business Information.
- *School Library Journal* (April 2001) (Journal providing reviews of children/young adult literature): Gr 2–4–Colorful photographs and brief texts fill the pages of these introductory titles. The table of contents is essentially identical for both: land, landmarks, homes, food, clothes, work, transportation, language, school, free time, celebrations, and the arts. Each topic is

On April 17, 2006 each member of the SMRC completed a review sheet for the Book that provided space for commentary on each of the 15 evaluative criteria contained in the School Board Rule. (*Id.*). All eight SMRC members found the Book educationally significant and developmentally appropriate, and seven SMRC members found the book to meet the accuracy criteria. (*Id.*). Indeed, the comments of the SMRC were almost uniformly favorable on all 15 criteria. (*Id.*). Moreover, six of the SMRC members expressly noted on their worksheets that they found the book to be apolitical, variously describing the Book as "scrupulously apolitical," having "no political slant," and no "political implications." (*Id.*).[9]

covered in a two-page spread with one large photograph and three or four lines of simple text per page. (For example, "Cruise ships stop at San Juan. They bring tourists to the islands," is followed by four more sentences about transportation in Puerto Rico).
Words in bold are explained in the glossary. A "Fact File" is found at the end of each volume along with identical lists of "Words You Can Learn," in Spanish. These books are similar in scope and reading level to the "Take a Trip" series (Watts), but provide fewer details. While the information is very basic and succeeds in giving only a glimpse at life in these countries, the books may be appropriate for collections needing easy titles on different nations.-Marilyn Long Graham, Lee county Library System, Estero, FL.

• *Booklist* (October 2001) (review journal-American Library Association): Gr. 2–4, younger for reading aloud. These books in the Vamos a series introduce the land, culture, and people of four Spanish-speaking countries-Puerto Rico, Colombia, Costa Rica, and Cuba. The texts are repetitive and somewhat dry, but they are easy to read, filled with facts, and accompanied by color illustrations and simple maps. Unfortunately, the nouns in the well-conceived glossaries are listed without the definite articles that accompany nouns in Spanish. Language learners won't, for example, know that capital is a feminine noun and aji is masculine. Isabel Schon is the director of the Barahona Center for the Study of Books in Spanish for Children and Adolescents, California State University, San Marcos.

• *Horn Book* (Fall, 2001) (Journal providing reviews of children/young adult literature): These books offer superficial introductions to geography, people, customs, language, and daily life. The formulaic texts in these Spanish editions are almost identical for Cuba and Puerto Rico, and none contains more than the barest amount of information. The large-print texts are accompanied by color photos of varying quality and relevance. A short list of facts is appended. Also available in English.

• *Publishers Weekly* (March 11, 2001) (Magazine covering publishing industry): Gr 2–4–These informative and colorful books can be placed either in a reference collection or in a circulating collection. The title pages feature a world map with the respective country highlighted, and a table of contents outlines the broad subject categories covered (e.g., points of interest, homes, food, clothing, work, transportation, language, education, entertainment, celebrations, and the arts). Information is offered in simple statements without commentary, the attractive layout features full-color photographs of children in many different scenes, and selected words are bolded within the text and later explained in the glossary. Appended are key facts about the country, an index, a bibliography, and a short list of words and their many variants. These books will be invaluable for homework assignments and will appeal to readers who are curious about life in other countries. Copyright 2001 Cahners Business Information.
(Plaintiffs' Exhibit 18).

9. Several members of the SMRC made personal comments on their ballots: (1) "I feel the book is apolitical, factually accurate and developmentally appropriate for elementary school children." (2) "I have read the book, 'A Visit to Cuba' and found the book to be scrupulously apolitical." (3) "This committee member finds this book appropriate for the age group. No political slant was detected; however author could have better written and researched the topic." (4) "No political slant

Following their discussion, the SMRC voted by secret ballot on the question of whether to retain or remove the Book from the library. By a vote of 7 to 1, the members of the SRMC voted to retain the Book.

### 2. School Board Intervention

Before the question was considered at the district level, a School Board member proposed that the School Board immediately remove ¡Vamos a Cuba! from the libraries without waiting for the administrative process concerning removal of the book to run its course. That School Board member, Frank J. Bolaños, added the following item to the School Board's April 18, 2006 agenda: **PROTECTING OUR CHILDREN FROM THE HURTFUL & INSULTING DISTORTIONS OF THE BOOK "VAMOS A CUBA" BY REMOVING THESE BOOKS FROM ALL OF OUR PUBLIC SCHOOL LIBRARIES.** Mr. Bolaños described ¡Vamos a Cuba! as "hurtful and insulting to both our Cuban–American community and those Cubans still living on the island under oppressive conditions." (Plaintiffs' Exhibit 19, Memo to School Board Members dated April 18, 2006). Mr. Bolaños then described a number of the book's passages as "distortions," followed by his comments, labeled "reality." (*Id.*). The following is a list of those passages and his comments:

- **Book's distortion:** "The people of Cuba eat, work and study like you," page 5.
 **Reality:** Nothing could be further from the truth. The people of Cuba survive without civil liberties and due process under the law and receive 10

to 20 year prison sentences for simply writing a document or voicing an opinion contrary to the party line. People are told where to work. They lose their job if they do not follow the dictates of the communist party. Children are indoctrinated and forced to chant Castro's greatness in class.

- **Book's distortion:** "White rice is the most common food in Cuba. Black beans are eaten. Arroz con Pollo is another favorite dish," page 12.
 **Reality:** Food is rationed; people stand in line for hours to ask for their measly ration only to be told they ran out. Children stop receiving their milk ration at age six.

- **Book's distortion:** "The major celebration in Cuba is 'Carnival.' It is celebrated on July 26th," page 26.
 **Reality:** The annual commemoration of July 26th is the symbolic observation of the rise to power of Castro's communist, totalitarian regime. It is a day of mourning for most Cubans. Cubans celebrate the 20th of May and the 28th of January, to celebrate their independence from Spain and the birth of Jose Marti, Cuba's greatest national hero.

- **Book's distortion:** "The celebrations in Cuba are a mix of African and Catholic roots," page 27.
 **Reality:** Historically, Castro's regime has prohibited or chastised those that engage in religious practices, including the Catholic Church and other organized forms of religion. Religious leaders, including Jehovah's Witnesses

was noted. Author could have better researched her topic." (5) "I feel the book is developmentally appropriate for Elementary school children. I don't feel that it has political implications." (6) "This book explains the information in a factual format without direct

political implications. It is developmentally appropriate for the age level it was written for. The material is valuable to the library media collection and could be supplemented and explained by mature classroom instruction."

have been imprisoned. A famous cry while facing Castro's firing squad was "Viva Cristo el Rey" (long live Christ the King).

The ensuing School Board testimony and debate on April 18, 2006 was characterized by repeated references to political issues and viewpoints and was sharply critical of the book for omitting negative political information about the Castro regime from its contents. For example, one School Board Member Perez made the point that the book was unacceptable in the same way that libraries do not allow books about pornography, "devil worship and other offensive things like that." (Plaintiffs' Exhibit 33, Transcript of School Board Meeting on April 18, 2006 ("April Transcript"), 60:9–60:12). She went on to compare the ¡Vamos a Cuba! to books featuring "Hitler Youth, or Nazism, or the KKK Youth." (April Transcript, 60:13–60:17). She opposed the book because she believes that "it is especially damaging to the sensibilities of this community." (April Transcript, 62:7–62:9). Likewise, School Board Member Logan reported that she wanted the book removed "as somebody who suffered [in Cuba] first-hand." (April Transcript, 69:20–69:22). School Board Member Bolaños, in favoring an immediate ban on ¡Vamos a Cuba!, criticized the review process as one that would not "satisfy the segment of our community that is outraged, that feels discriminated against by this book." (April Transcript, 73:3–73:11). He complained that the process required someone to complain at each of the more than 30 schools bearing the book. (April Transcript 73:9–73:11). School Board Member Tabares Hantman also prefaced her opinion on the agenda item with the comments, "I am a Cuban American. I was born in Cuba. And as the other board members said, my family, and my father and mother lost everything that

they had worked for." (April Transcript, 80:13–80:22).

Following the debate, the School Board's attorney discussed some of the constitutional concerns surrounding the proposed action. She specifically informed the School Board that there was a governing rule that provided due process and procedures for removing a book from the school library. (April Transcript, 56:2–56:5). She warned that "the ultimate decision of this board, would only be appropriate after following all levels of due process procedures in our book removal process." (April Transcript, 56:14–56:18). Moreover, she urged the School Board to be "mindful of it's own board rule and follow that board rule in this issue to avoid constitutional challenges." (April Transcript, 56:19–56:24). Her colleague expanded on these ideas somewhat, reminding the School Board that what is at issue is a "constitutional due process procedure" that protects parents and their First Amendment rights. (April Transcript, 58:3–58:9). In closing, the School Board's attorney stated that there was no provision in the School Board's rules to allow the Board to "act independently and remove a book that it finds objectionable. Rather, it must follow the process that is in that rule in order to achieve that purpose." (April Transcript, 58:16–58:22).

At the close of debate, the School Board voted 6 votes to 3 to allow the administrative process surrounding the retention of the Book to proceed to its eventual conclusion. (April Transcript, 89:22–90:5).

3. District Level Review

On April 21, 2006, the principal of Marjory Stoneman Douglas Elementary School informed the Regional Superintendent and Mr. Amador of the SRMC's decision. Mr. Amador, in turn, exercised his right to file a formal appeal with the School District

pursuant to another section of the School Board Rule.

The Superintendent then convened a 17–member ad hoc District Materials Review Commission ("DMRC") charged with considering Mr. Amador's appeal of the SRMC's decision. The Superintendent appointed a wide variety of professionals and lay people to the DMRC, including: the Regional Center Superintendent; the Principal of Lakeview Elementary School; the Principal of Coral Way K–8 Center; the Administrative Director of Instructional Technology, Instructional Materials, and Library Media Services; the Directors of Division of Social Sciences; the Instructional Supervisor of Language Arts; the Instructional Supervisor of Library and Media Services; a Reading Coach from Martin Luther King Elementary School; the Library Media Specialist from Phillis Wheatley Elementary School; the Library Media Specialist from Key Biscayne K–8 Center, a student from South Miami Senior High School; a designee from United Teachers of Dade; the President of the Dade County Council of Parent–Teacher/Parent–Teacher–Student Associations; a representative of the Florida House of Representatives; and the President of the Spanish American League Against Discrimination.[10] (Plaintiffs' Exhibit 7, Memo from Rudolph F. Crew, Superintendent of Schools to the Honorable Chair and Members of The School Board of Miami–Dade County, Florida).

On April 28, 2006, JulieAnn Rico Allison, the School Board Attorney, sent a memorandum to the School Board concerning the Cuba Books and the potential to remove those books from libraries in the School District (the "Allison April Memo"). (Plaintiffs' Exhibit 12). The memo appears intended to keep the School Board apprised of activities concerning the status of the Cuba Books' removal. Within the Allison April Memo are details concerning the composition of the DMRC, the DMRC's process for reviewing and making recommendations concerning the Cuba Books (including the 15 evaluative criteria poised for consideration), and the process for an appeal of that decision. (*Id.*).

On May 22, 2006, Superintendent Crew sent a Memo to the Deputy Superintendent Curriculum, Instruction and School Improvement in which he laid out a number of options for the DMRC to consider. (Plaintiffs' Exhibit 5, p. 14). His comments were the following:

- Other materials that present a more accurate and complete description of life in Cuba will be identified immediately and, if not already available, be made available immediately in library media centers with *Vamos a Cuba/A Visit to Cuba* in their collections. These materials would include *Cuba for Kids*, the book mentioned at the most recent Board meeting. The District already owns many more copies of this book than *Vamos a Cuba*, although it is not present in all the libraries that own *Vamos a Cuba*.

- A bookplate will be placed in the inside cover of the books *Vamos a Cuba* and *A Visit to Cuba* that explains to students and parents that statements in those books are incomplete or inaccurate in many cases and that directs them by title to the alternate materials that have been identified as more factually correct and complete descriptions of life in Cuba and are available

10. The Superintendent originally appointed Rudy Pittaluga, Sr., who was president of SALAD to the DMRC. However, Dr. Lydia Usategui actually served on the DMRC as the group's representative.

in their school's library media center (see attached language).[11]

- The books *Vamos a Cuba/A Visit to Cuba* will be checked out only with parental consent.

As it turned out, the DMRC did not adopt any of the suggested options, and disagreed with the Superintendent's initial observations about inaccuracies and omissions.

The DMRC met on May 22, 2006 and June 5, 2006 to consider the merits of Mr. Amador's appeal. (Plaintiffs' Exhibit 5, Memo dated June 7, 2006 from Antoinette Dunbar, Deputy Superintendent Curriculum, Instruction, and School Improvement to Dr. Rudolph F. Crew, Superintendent of Schools (the "June 7 Dunbar Memo")). Each of the DMRC members received a packet of materials that included Mr. Amador's complaint, copies of both *¡Vamos a Cuba!* and *A Visit to Cuba*, and the School Board Rule (including the criteria for evaluating the Cuba Books). At the first meeting, Chairperson Antoinette Dunbar, Deputy Superintendent, Curriculum, Instruction, and School Improvement, asked the DMRC members to vote on which of the evaluative criteria they believed were most important to consider in order to streamline the process. (Plaintiffs' Exhibit 7, DMRC May 22, 2006 Minutes). The result of the vote was that the DMRC decided to focus on the criteria of Educational Significance, Appropriateness and Accuracy. (*Id.*).

At its meeting on May 22, 2006, the DMRC discussed both the Cuba Books' educational significance at length. (Sup-

plemental Declaration of Ronald Bilbao in Support of Plaintiffs' Motion for A Preliminary Injunction (the "Supplemental Bilbao Declaration"), ¶ 9). The members of the DMRC broke into smaller groups to review other books from the "A Visit To" series without comparing them to the Cuba Books. (DMRC May 22, 2006 Minutes). The DMRC then discussed the books reviewed, with various participants noting such things as the fact that the books have a formulaic format and that there are books about other communist countries (i.e., China and Vietnam). (*Id.*). One participant stated that the titles of the Cuba Books are "misinterpretations" because they mistakenly imply that one can visit Cuba freely. (*Id.*). Another participant observed that *A Visit to Cuba* has less specific information that does *A Visit to Vietnam.* (*Id.*). Another pointed out that there is a mistake regarding page 29 of the Cuba Books in that they refer to a cave painting as erroneously created 1,000 years ago. (*Id.*).

The DMRC eventually determined that the Cuba Books met the educational significance criteria of the School Board Rule, noting in the process that the books were supplemental and not mandatory, and that they were valuable to an individual course of study. (Supplemental Bilbao Declaration, ¶ 9). Although the Chairperson distributed copies of other books in the Series, those books were not reviewed under the evaluative criteria. (*Id.* at ¶ 6).

At the beginning of the DMRC's second meeting on June 5, 2006, one of the participants distributed a document titled "A

---

11. The attachment reads as follows:
ATTENTION STUDENTS AND PARENTS. This book was purchased by your school as part of a series of books on many foreign countries. Some of the information provided in this book about life in Cuba under that nation's communist dictatorship is in-

correct or incomplete enough to be inaccurate. For an accurate depiction of life in Cuba, Miami–Dade County Public Schools recommends the following books that can be found in this school's library. *Cuba for Kids* by Ismael Roque–Velasco.

Content Analysis of the Book Vamos A Cuba" by Juan Clark (the "Article"). (Id. at ¶ 12; Plaintiffs' Exhibit 21). The Article contains the following observations, among others:

- **The people in Cuba *eat, work,* and *study* like you. But in Cuba there are unique things.**

 *It is ignored that there is a rationing system for food in place since 1962, causing a great amount of anguish in all households. There is very little private work since the system attempts to keep a tight control on this economic dimension, to the point of making it a crime to exercise private initiative or to have private practice of a profession. Practically everyone must work for the government. Education is permeated by political control and indoctrination, as well as by discrimination, but with great privilege for children of the elite.*

- **In the countryside, houses are simple. They are built with palm trunks. The roofs are made of palm leafs or straw.**

 *It should have been said that many houses are built that way, but certainly not the majority of those in the countryside. Furthermore, the described houses (bohios) are not built with the trunk of the royal palm since that would destroy the palm, but with (the yagua), the upper part attached to the trunk of the long leaf (the penca). No straw is used in the roof, only the leafs.*

- **...All students do some work during the school day. Some work in the garden. The older ones working factories.**

 *This is absolutely wrong. From the 6th grade on, students go to the countryside for a period of 45 days to do unpaid agricultural work, fulltime.*

*Nowadays, from the senior high level, all must go to the countryside to do unpaid agricultural work, on a permanent basis, alternating half day in the fields and half in the classroom. Needless to say that learning suffers. In addition to great implications of the forced separation from the families at that age and the undesirable environmental conditions. High pregnancy rates in adolescence are a bi-product of this system.*

- **In a Cuban valley, there are big colored paintings, on the rocks and caves. These were painted by Cuba's inhabitants about a thousand years ago.**

 *This is probably the worst factual error in the book. This paint was made in the 1960s; it is advertised that way in Cuban tourist information and in the Internet, yet, unbelievably, the writer introduces this gross misinformation that really has no excuse. This huge painting, called* Mural de la Prehistoria *is located in the Valle de Viñales in Pinar del Rio province.*

Later in the meeting, a representative of SALAD distributed a pamphlet featuring a picture of Adolf Hitler on the cover. (Supplemental Bilbao Declaration, ¶ 15). Throughout the meeting members of the public make interrupted the DMRC's discussions, often whispering the word "communist" whenever DMRC members spoke favorably about the Cuba Books. (*Id.* at ¶¶ 11, 13).

The DMRC devoted its attention to the other prioritized evaluative criteria, appropriateness and accuracy. (Plaintiffs' Exhibit 36, DMRC June 5, 2006 Minutes). It also considered the Book in light of the criteria of scope, special features, translation integrity, and aesthetic quality. (Bilbao Declaration, ¶ 16). Another consideration was "missing facts," and whether

those facts were meant to be included in a book for young children. (DMRC June 5, 2006 Minutes). Towards the end of the meeting, Representative Rivera resigned from his participation on the DMRC, noting that it had been "infiltrated by the Superintendent." (*Id.* at ¶ 18; June 7 Dunbar Memo).

Chairperson Dunbar then explained to the remaining members of the DMRC that there were four possible actions they could vote on with respect to the handling of the Cuba Books. They were: (1) keep the Cuba Books in the library; (2) leave the Cuba Books in the library but allow the students to use alternate materials; (3) limit the use of the Cuba Books; or (4) remove the Cuba Books from the total school environment. (*Id.* at ¶ 19; June 7 Dunbar Memo). The DMRC voted fifteen to one to retain the Cuba Books in the libraries with no restrictions. (Plaintiffs' Exhibit 5).

### 4. Superintendent's Review

On June 7, 2006, the Superintendent affirmed the DMRC's recommendation. (*Id.*; Plaintiffs' Exhibit 4, Memo dated June 7, 2006 from Rudolph F. Crew, Superintendent of Schools to Honorable Chair and Members of the School Board of Miami–Dade County, Florida). Specifically, the Superintendent stated that the DMRC had forwarded its recommendation to him, and "[a]fter reviewing that information, I have decided to affirm the recommendation." (*Id.*). The Superintendent then notified Mr. Amador of his decision in a letter dated June 8, 2006, wherein he also advised Mr. Amador of his right to appeal his decision to the School Board. (Plaintiffs' Exhibit 3, Letter dated June 8, 2006 from Rudolph F. Crew, Superintendent of Schools to Mr. Juan Amador). On June 8, 2006, Mr. Amador filed a formal appeal of the DMRC's decision with the School Board, requesting that it decide his appeal at the June 14, 2006 School Board meeting. (*Id.*).

### 5. School Board Level Review

On June 7, 2006, the School Board's attorney issued a Supplemental Opinion on the Book Rivera and Removal Process Under Board Rule 6Gx13–6A–1.26 (the "Allison June Memo"). (Plaintiffs' Exhibit 12). The Allison June Memo details the remaining steps in the appellate process, the options available to the School Board in terms of providing access to the Cuba Books, the legal standards that apply to challenges to school library books, and the legal consequences should the School Board reject the DMRC's decision. (*Id.*). The School Board's attorney advises, in pertinent part:

> The DMRC merely reviewed the decision of the SMRC and the complaint of a parent from one school requesting that the book be removed from his child's school library. There is no provision in the Rule for a district-wide removal of a school library book stemming from a DMRC review. Although the Rule does not prohibit the Board from making a decision affecting the District as a whole, such District-wide impact would be more susceptible to legal challenge because the Rule apparently contemplates independent school-by-school decisions regarding books....

> [I]t is important for the Board to carefully and thoughtfully consider the recommendations of the DMRC and Superintendent. The Board should be careful to state its legitimate, constitutionally-sound reasons for its decision and the reasons for deviation from the DMRC and Superintendent's recommendations ....The Board's decision should be memorialized in a formal order, which would be rendered by filing with the

Clerk of the School Board. The order should contain the Board's findings and conclusions showing the rationale for the Board's decision....

[I]t is our opinion that deviation from the DMRC's decision, especially in light of the extensive analysis and deliberations by the DMRC, would most likely subject such a decision by the Board to a legal challenge.... [I]t is exceedingly important that the Board identify with specificity the legal grounds for any Board decision, particularly any decision that deviates from the DMRC's recommendations. Moreover, it is our opinion that even a well reasoned decision by the Board that deviates from DMRC's recommendations will expose the Board to liability.

(Plaintiffs' Exhibit 12). The matter became an item on the School Board's agenda, and the School Board was asked to either affirm the Superintendent's recommendation as its Final Order, reject the recommendation and make specific findings and conclusions in support of the decision.

On June 7, 2006, in preparation for the School Board's upcoming meeting, Mr. Bolaños submitted another resolution for the School Board to consider, entitled:

**TEACHING OUR CHILDREN THE TRUTH ABOUT CUBA BY REMOVING THE BOOK "VAMOS A CUBA" FROM ALL OF OUR PUBLIC SCHOOL LIBRARIES & REPLACING THEM WITH HISTORICALLY ACCURATE & EDUCATIONALLY RELEVANT BOOKS**

The proposal states that "[t]his book and its errors of commission and omission should not remain in the hands and minds of innocent five to nine year old children."

At its meeting on June 14, 2006 the School Board considered Mr. Amador's appeal. Mr. Amador addressed the School Board, noting that he did not seek to censor anything, but rather to "assert the right that we have as parents to oversee the education of our children." (Plaintiffs' Exhibit 34, June 14, 2006 Transcript, 6:4–6:8). Following their discussion, the School Board rejected the Superintendent's decision that affirmed the two previous review committees. The School Board's Final Order of the School Board of Miami–Dade County, Florida (the "Final Order") states in its entirety:

Upon a review of the complete Record of the proceedings below, including the transcript of the proceedings on Board Agenda Item G–3 (incorporated herein by reference and attached hereto, and made a part of this Final Order), the Superintendent's recommendation sustaining the District Materials Review Committee's decision is hereby rejected. The foregoing is based upon the findings reflected by the record of these proceedings, and more specifically the finding that the book is inaccurate and contains several omissions. It is further ordered that this book and the series it is part of, be replaced, throughout the school district, with a more accurate set of books that is more representative of actual life in these countries. (Plaintiffs' Exhibit 15).

Through its Final Order, the School Board established two mandates. First, the Final Order commands the removal of the Cuba Books from all school libraries in the School District. Second, the Final Order requires the removal of all other books in the Series from all school libraries in the School District.

The undisputed testimony at the evidentiary hearing was that the Cuba Books, together with all the remaining books in the Series have been removed from the shelves of all libraries within the School District and are currently stored in a

warehouse facility. The complete list of books removed is set forth in Plaintiffs' Exhibit 44. At the time of the preliminary injunction hearing, public school students living in Miami–Dade County were unable to access the Cuba Books or the remaining books in the series in their school libraries and would not be able to do so when the Miami–Dade Country Schools open on August 14, 2006.

*C. Commentary from School Board Members*

The School Board's June 14, 2006 decision contains no specific findings regarding any of the books ordered removed. Therefore, I turn to the transcript from the meeting to elicit commentary by School Board members on the subject.

Six School Board members voted to remove the Cuba Books and the Series to which they belong from the libraries within the School District. Below are a number of comments from the members of the School Board who voted on the issue of removal.

### 1. Chairman Augustin J. Barrera

In beginning the deliberations on June 14, 2006, School Board Chairman Barrera stated that Mr. Amador filed the complaint about the Book "because he feels that this is offensive, not only to him, but to the Cuban community." (Transcript from School Board Meeting, Book Challenge, June 14, 2006 ("June Transcript"), 9:15–9:18). Later, Chairman Barrera described the matter before the School Board as involving "issues of inaccuracies, it's issues of omissions, because sometimes the words that are not said are more powerful that those words which are said, and sometimes there's generalities, which how this book is portrayed." (June Transcript, 9:20–9:24). Chairman Barrera continued:

There is a couple of images that, you know, to the average person it's just kids in school uniforms, but to me as a Cuban, and to the Cuban American community, we see kids in uniforms and they're called the Pioneers, and that represents what is there today, which is a dictatorship of Fidel Castro. So, yes, we are offended. Even though it doesn't say anything but the cover of that book is offensive to us as a community.

It also talks about July 26th celebrating Carnival. Well, my understanding is they were celebrating Carnival before on July 26th, but July 26 also has another representation to us that some people may not be aware of. That is the day that Fidel Castro's revolution started so, to us, that day has a significance that that book fails to mention.

(June Transcript, 11:9–12:1). Chairman Barrera also remarked that "it's in the lack of information that I think we as the Cuban community are offended." (June Transcript, 13:13–13:14). He also noted that during the course of things, he and fellow Board member Ana Rivas Logan ("Logan") had been referred to as "communists."(June Transcript, 14:16–14:22).

### 2. Ana Rivas Logan

Board Member Logan began her comments by noting that she also came from "an oppressed regime." (June Transcript, 15:20–15:21). She noted that "from the very first day that [she] reviewed the book found the book extremely offensive, inaccurate, full of omissions." (June Transcript, 17:12–17:15). In the end, she reached the conclusion that the entire Series should be replaced with "a new and updated series,..." (June Transcript, 18:19–18:25).

### 3. Frank Bolaños

At the School Board meeting, Mr. Bolaños noted that the Cuba Books' "acts of commission, and omission does not teach our children the truth about Cuba," and therefore should be removed from the School District's libraries. (June Transcript, 20:10–20:14).

### 4. Tabares Hantman

Board Member Tabares Hantman opened with a statement to stand firmly in *her* "commitment to stand with the Cuban American community, which I am a very proud member." (June Transcript, 21:17–21:19). She then proceeded to provide some thoughts about being born in Cuba and watching her family suffer under the current regime, a portion of which states:

> The autocratic and tyrannical regime that rose in Cuba prevented millions of people, my family and others, from being able to fulfill their hopes and their dreams. And I sincerely hope that non-Cuban Americans of our community can recognize and empathize with the great sadness and regret we Cuban Americans feel even to this day.

(June Transcript, 22:19–23:1). After recounting her family's suffering, Board Member Hantman stated that she could not support "the presence of a book in our school that creates a misleading and inaccurate portrait of Cuba." (June Transcript, 24:12–24:14). In her final comments, Board Member Hantman stated that she must support removal of the Book because she "would not be doing [her] job as a Cuban American, or [her] job as a board member if [she] were to reach any conclusion," and she noted that there were at least 14 omissions or untrue statements in the Book. (June Transcript, 24:19–25:1).

### 5. Evelyn Langlieb Greer

Board Member Greer declared the system for lodging complaints about so-called offensive library materials as an "excellent process." (June Transcript, 31:21–31:23). That process, she continued, culminated in a decision where 22 professionals decided the Cuba Books were appropriate. (June Transcript, 33:4–336). Those educators determined that the Cuba Books did not bear the "serious, material, irrevocable and clear inaccuracies and biases" that she felt provided grounds to justify removing a book from the school system. (June Transcript, 34:17–35:2). She described the School Board's activities as follows:

> We are rejecting the professional recommendation of our staff based on political imperatives that have been pressed upon members of this board, which I completely understand, and with which I sympathize, but one of the things we did when we took an oath of office today is to uphold the Constitution of The United States as it has been set down and interpreted by the United States Supreme Court.

(June Transcript, 35:13–35:20).

### 6. Dr. Martin Karp

Board Member Karp presented some suggestions for addressing the situation, including distributing a supplementary guide for parents to use in working with the Cuba Books whenever those books are checked out of the library. (June Transcript, 37:8–37:12). Board Member Karp also suggested using parent consent forms so that parents can be made aware when their children check out the Cuba Books. He also suggested providing companion books at check out. (June Transcript, 37:12–37:19).

### 7. Dr. Robert B. Ingram

A number of Board Member Ingram's comments found their way into the news

media following the June 14, 2006 meeting. For instance, Board Member Ingram stated that, if certain Board Members did not vote for the measure to remove the Cuba Books, "they can't go home, they might find a bomb under their automobiles,..." (June Transcript, 40:14–40:18). He went on to say that he could not vote his the way his conscience directed "without feeling threatened." (June Transcript, 44:14–14:15).

### 8. Dr. Marta Perez

Board Member Perez characterized Board Member Ingram's comments as "divisive," and that his attempts to dramatize the outside pressures on the School Board to be "really inappropriate and offensive." (June Transcript, 47:1–47:10).[12]

### III. FIRST AMENDED COMPLAINT

■ As noted above, Plaintiffs filed a First Amended Complaint on July 19, 2006. Federal Rule of Civil Procedure 15(a) allows a party to amend its complaint once without leave of court "any time before a responsive pleading is served." A motion to dismiss is not a responsive pleading. *Williams v. Board of Regents of the Univ. Sys. of Georgia,* 441 F.3d 1287, 1296 (11th Cir.2006) (citing *Chilivis v. SEC,* 673 F.2d 1205, 1209 (11th Cir.1982)). Therefore, it was within Plaintiffs' discretion to file the First Amended Complaint. Technically, Plaintiffs' filing renders De-

---

**12.** It does not appear that Board Member Solomon C. Stinson spoke at the June 14, 2006 meeting.

**13.** Despite this Court's instruction in the Amended Order Denying Emergency Motion for Temporary Restraining Order and Setting Motion for Preliminary Injunction that Defendants should file "any motions directed the Complaint" no later than July 14, 2006, Defendants took it upon themselves to reserve filing a memorandum of law in support of their Motion to Dismiss until July 18, 2006.

fendants' Motion to Dismiss moot. Nevertheless, I have considered below the most salient issue contained in the Motion to Dismiss, namely, two of the Plaintiffs' standing in this case.

### IV. STANDING

■ It is axiomatic that, in order for there to be a justiciable "case or controversy," a party must have standing to seek the relief requested. *Florida Pub. Interest Research Group Citizen Lobby, Inc. v. EPA,* 386 F.3d 1070, 1083 (11th Cir.2004). At the outset, the party that invokes federal jurisdiction bears the burden of proof on standing. *Florida Public Interest,* 386 F.3d at 1083.

Defendants originally sought to dismiss the Complaint on grounds that Plaintiffs lack standing.[13] In assessing the arguments raised in support of dismissal, I must accept as true all allegations found within the Complaint. *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206–07, 45 L.Ed.2d 343 (1975). However, since the parties have filed affidavits relating to the issue, I may consider those affidavits in reaching my decision on standing. *Id.* at 501–02, 95 S.Ct. 2197. I will evaluate whether Aidan Balzli, Mr. Balzli's son, and the ACLU, have standing in this case.

### A. Aidan Balzli

To have standing, a plaintiff must establish that (1) he suffered an injury in fact

---

Presumably, Defendants' reasoning is that they seek dismissal on standing grounds, and based on my July 6, 2006 Order Requiring Supplemental Briefing on Standing Issue, they need not address those issues until July 18, 2006 (when their response to Plaintiffs' memorandum of law on standing was due). Defendants' chosen course of action resulted in Plaintiffs having only one day to respond to the Motion to Dismiss, a fact that I find inappropriate given all parties' awareness of the abbreviated briefing schedule in this case.

that is concrete, particularized, and actual or imminent; (2) there is a causal connection between the injury and the conduct complained of; and (3) the injury will likely be redressed by a favorable decision of the court. *Sierra Club v. Johnson,* 436 F.3d 1269, 1276 (11th Cir.2006) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992)); *National Alliance for Mentally Ill, v. Board of County Comm'rs of St. Johns County,* 376 F.3d 1292, 1296 (11th Cir.2004).

Plaintiffs contend that Mark Balzli has standing to sue on behalf of his son, Aidan Balzli. In the Declaration of Mark Balzli ("Balzli Declaration"), Mr. Balzli states that he is a member of the ACLU, and a parent of a six year-old, Aidan Balzli, who is enrolled in a public school in the Miami–Dade County School District. (Balzli Declaration ¶ 1 and 2). He further states that he wants his son to have access to both *¡Vamos a Cuba!,* and *A Visit to Cuba* through the library at the school his son attends. (*Id.* at ¶ 3). He had planned to check out the book and read it with his son before the School Board entered its Final Order. (*Id.*).

Mr. Balzli also testified at the preliminary injunction hearing. His testimony reveals that as a parent of a student attending North Beach Elementary, he is entitled to accompany his son to the school library before the school day begins or after it concludes. He also testified that he is aware that the Miami–Dade School system has an inter-library loan system of exchanging books between schools.

A number of other witnesses testified about the school libraries' accessibility to parents of school-children in Miami–Dade County. For instance, Maria Tavel–Visie-do, a principal of an elementary school in the School District, testified that Miami–Dade County schools encourage parents to visit the libraries with their children. She also explained that parents may view the libraries' collections over the Internet and actually request that books be moved between schools for the benefit of their children. Although a child must check out a book from the school library, the testimony makes clear that a parent may accompany a child into the library for the purpose of selecting and withdrawing books to read.

Defendants insist that Mr. Balzli has no standing to redress infringements of his son's rights. They rely on *Case v. Unified Sch. Distr. No. 233,* 908 F.Supp. 864, 874 (D.Kan.1995) for this proposition. In *Case,* a district court dismissed the parents' complaints that their children were denied access to a book removed from the school library because the decision did not abridge the parents' constitutional rights. *Id.* at 873. The opinion noted that parents may only use the high school libraries on a limited basis, when the school district hosts certain "Media Center Nights." *Id.* at 871.[14]

■■■ *Case* ignores the fundamental principle that children are often unable to litigate for themselves and therefore are frequently represented in litigation by their parents. *Smith v. Org. of Foster Families For Equal. & Reform,* 431 U.S. 816, 841, 97 S.Ct. 2094, 2108 n. 44, 53 L.Ed.2d 14 (1977) ("children usually lack the capacity to make [decisions about their best interests], and thus their interest is ordinarily represented in litigation by parents or guardians."). Specifically, under Florida law, which applies here under Fed-

---

**14.** I later discuss *Case* in terms of First Amendment issues. I concur with the district judge's First Amendment analysis, but I decline to follow his conclusions on standing and procedural due process.

eral Rule of Civil Procedure 17(b), children may not bring suit due to the disability of nonage of minors. *Kingsley v. Kingsley*, 623 So.2d 780, 784 (Fla. 5th DCA 1993) ("[u]nless a child has a guardian or other like fiduciary, a child must sue by his next friend; however the next friend does not become a party to the suit.").[15] Children can only bring suit through a "next friend." *Id.* This means that, in order to redress a violation of his First Amendment rights, Aidan Balzli had to sue through a "next friend," which in this case is his father.

*Case* is also factually distinguishable on a number of grounds. First, it relies upon Kansas law, which is slightly different from Florida law in that although it requires minors to sue through a next friend, it expressly states that minors have the capacity to sue and be sued. *In re Morehead,* 10 Kan.App.2d 625, 706 P.2d 480, 481 (1985). Second, *Case* is distinguishable because the Miami–Dade County School District encourages parents to use the school libraries with their children to a greater extent than that allowed in *Case.* Mr. Balzli has the right to visit the library with his son, review books that are kept there, accompany his son through the check-out process, and transfer books between libraries. The *Case* decision explains that parents have much more limited access to the school libraries. Mr. Balzli's connection to the issues in this case therefore extend beyond the mere formality of representation of his son as a "next friend." In any event, I reject the analysis employed in *Case* as illogical, and contrary to the greater weight of authority that allows parents to bring suit on behalf of their children. *See e.g., Campbell v. St. Tam-*

*many Parish Sch. Bd.,* 64 F.3d 184, 187 (5th Cir.1995); *Minarcini v. Strongsville City Sch. Distr.,* 541 F.2d 577, 582 (6th Cir.1976); *Counts v. Cedarville Sch. Distr.,* 295 F.Supp.2d 996, 999 (W.D.Ark.2003). Therefore, I decline to apply *Case* here.

■ Mr. Balzli states that he and his son wished to read *¡Vamos a Cuba!* The effect of the Final Order interferes with Aidan Balzli's right to access *¡Vamos a Cuba!* from his school's library. This is a harm which is imminent, which the School Board caused through enactment of its Final Order, and which can be redressed through injunctive relief entered by this Court. I conclude that Mr. Balzli may seek to redress this alleged interference with his son's First Amendment rights.

■ Mr. Balzli also has standing to redress infringement of his son's due process rights. Plaintiffs complain that the School Board's decisions to ban books in the Series other than the Cuba Books, and to ban the entire Series district-wide violated due process because the School Board failed to follow its own administrative procedures. Aidan Balzli was formerly able to obtain copies of the Cuba Books and other books in the Series through his school's interlibrary loan system. Now, Aidan Balzli may not withdraw any Books in the Series because the School Board has removed them from the school system. Since the School Board made this decision without following its established procedures, Plaintiffs argue, Aidan Balzli's due process rights have been violated. Once again, Aidan Balzli does not have the capacity to bring suit to redress these purported violations. Mr. Balzli, as Aidan's parent, may redress those alleged violations for him.[16]

---

**15.** Federal Rule of Civil Procedure 17(b) provides that, "[t]he capacity of an individual, other than one acting in a representative capacity, to sue or be sued shall be determined by the law of the individual's domicile."

**16.** Defendants did not raise a standing objection to Plaintiffs' Fourteenth Amendment due process claims.

## B. ACLU

Plaintiffs assert that the ACLU has a membership that numbers 3,500, including individual parents whose children attend schools in the School District and who wish their children to have access to the Cuba Books. Mr. Balzli, who is a member of the ACLU, seeks relief on behalf of his son in the form of an injunction preventing enforcement of the Final Order and precluding the removal of the Cuba Books from the School District's libraries.

■■■■ An organization has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *Johnson,* 436 F.3d at 1276; *Sierra Club v. Tennessee Valley Auth.,* 430 F.3d 1337, 1344 (11th Cir.2005). These three prerequisites are all that is required for organizational standing, meaning that if an organization satisfies those prerequisites, it is irrelevant that no individual member has brought suit or the organization declines to name a member in the lawsuit. *Doe v. Stincer,* 175 F.3d 879, 882 (11th Cir.1999). Defendants challenge only the first prong of the organizational standing test, and therefore I devote my attention to that prong only. *Johnson,* 436 F.3d at 1276 (addressing only the member/standing requirement of the organizational standing inquiry where the defendant failed to challenge the remaining requirements).

I have already determined that Mr. Balzli has standing to redress infringements of his son's rights. Therefore, it appears that the first and only relevant prong of organizational standing is satisfied. The ACLU's standing in this case is akin to other cases where ACLU-related entities had standing to pursue the First Amendment rights of their individual members. *See, e.g., American Civil Liberties Union of Nevada v. Heller,* 378 F.3d 979, 984–85 (9th Cir.2004) (ACLU had standing on its own and on behalf if its members to challenge state statute on First Amendment grounds where several of its members had been prosecuted under the challenged statute); *American Civil Liberties Union v. City of Pittsburgh,* 586 F.Supp. 417, 420–21 (W.D.Pa.1984) (individuals who could not purchase *Hustler* magazine due to the mayor's prohibition of its sale conferred standing on the ACLU to prosecute free speech claims on their behalf); *Fitts v. Kolb,* 779 F.Supp. 1502, 1510 (D.S.C.1991) (because the ACLU's members "frequently take controversial public positions on public officials, public figures, and matters of public concern," the ACLU had standing on behalf of its members to challenge a state criminal libel statute); *American Civil Liberties Union of Ohio Found., Inc. v. Ashbrook,* 375 F.3d 484, 490 (6th Cir. 2004) (lawyer who frequented a courtroom where the Ten Commandments was on display had individual standing to sue under the First Amendment, thereby giving the ACLU standing as well); *American Civil Liberties Union of Kentucky v. McCreary County,* 96 F.Supp.2d 679, 683 (E.D.Ky.2000) (issuing preliminary injunction and finding that the ACLU had standing to challenge the posting of the Ten Commandments in the county courthouse); *American Civil Liberties Union of Georgia v. Rabun County Chamber of Commerce, Inc.,* 698 F.2d 1098, 1108–09 (11th Cir.1983) (ACLU had standing to raise Establishment Clause claim where individual plaintiffs suffered distinct non-economic injuries).

Defendants challenge the ACLU's standing. They acknowledge the cases where parents sue on behalf of their children on First Amendment issues, but note that in such cases the parents are not parties to the action and are not suing in their own rights. In this case, Defendants posit, it is necessary to focus on Mr. Balzli's own status because he is a member of the ACLU; his son is not. Defendants characterize Mr. Balzli's procedural posture as one where he is a party in interest for the benefit of the ACLU's standing. *Watson v. State Farm Mut. Auto. Ins. Co.,* 639 So.2d 687, 688 (Fla. 2d DCA 1994) ("[w]hen a minor is represented by a parent as 'next friend,' the 'next friend' is not a party to the action; the real party in interest is the minor."). It is Defendants' position that standing is lacking because Mr. Balzli's son is the true party in interest, and he is not a member of the ACLU.

While Defendants' analysis is novel, it reaches an illogical result. As Defendants acknowledge, under Florida law, Aidan Balzli may only bring suit through a next friend, in this case, his father. Therefore, his father has standing to pursue relief on his behalf. The meaning of the requirement that "members would otherwise have standing to sue in their own right" is that the individual would have standing independent of his affiliation with the ACLU. *Freedom Republicans, Inc. v. Fed. Election Comm'n,* 13 F.3d 412, 416 (D.C.Cir. 1994) (for organizational standing to exist, individual members of organization "must independently meet the requirements of Article III."). This is to distinguish organizational standing from standing that arises when the ACLU's own constitutional interests have been infringed. *See, e.g., Rhode Island Affiliate, American Civil Liberties Union, Inc. v. Rhode Island Lot-*

*tery Comm'n,* 553 F.Supp. 752, 768 n. 12 (D.R.I.1982) (in case where the ACLU challenged the state's denial of a license to hold a charitable raffle, noting that "[i]t is well established that a corporation, such as the ACLU, has standing to assert violations of the First and Fourteenth Amendments under § 1983, both with respect to freedom of speech, and freedom of association") (internal citations omitted). It does not mean that only the true party in interest may bring suit, and Defendants cite no authority to that effect. Mr. Balzli's standing to sue on his son's behalf is independent of his affiliation with the ACLU. Accordingly, I find that the first and only relevant element of organizational standing is satisfied.

Because Mr. Balzli, on behalf of his son, and the ACLU both have standing in this case, I need not consider whether the remaining Plaintiffs have standing as well. *Village of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 264 n. 9, 97 S.Ct. 555, 562 n. 9, 50 L.Ed.2d 450 (1977) ("Because of the presence of this plaintiff, we need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit."); *Rabun County,* 698 F.2d at 1108–09 ("Because we have determined that at least these two individuals have met the requirements of Article III, it is unnecessary for us to consider the standing of the other plaintiffs in this action."). Moreover, given the filing of the First Amended Complaint, Defendants' arguments in support of the Association's dismissal are moot.[17]

## V. STANDARD FOR PRELIMINARY INJUNCTION

The Eleventh Circuit has stated that the "grant or denial of a preliminary

---

17. I deny the Motion to Dismiss as moot, but this finding is without prejudice for Defen-

dants to raise the arguments again when this case is ripe for discussion on the merits.

injunction is a decision within the sound discretion of the district court." *Sierra Club v. Georgia Power Co.*, 180 F.3d 1309, 1311 (11th Cir.1999). The Eleventh Circuit requires the party moving for a preliminary injunction to meet four factors: (1) the moving party demonstrates a substantial likelihood of success on the merits; (2) the preliminary injunction is necessary to prevent irreparable injury; (3) the threatened injury outweighs the harm the preliminary injunction would cause to the non-moving party, and (4) the preliminary injunction would not be adverse to the public interest. *Parker v. State Bd. of Pardons and Paroles*, 275 F.3d 1032, 1034 –1035 (11th Cir.2001); *Warren Publ'g, Inc. v. Microdos Data Corp.*, 115 F.3d 1509, 1516 (11th Cir.1997); *Teper v. Miller*, 82 F.3d 989, 992 n. 3 (11th Cir. 1996); *Northeastern Fl. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fl.*, 896 F.2d 1283, 1284 (11th Cir.1990); *Haitian Refugee Center, Inc. v. Nelson*, 872 F.2d 1555, 1561–62 (11th Cir. 1989); *Canal Auth. of State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974). Accordingly, Plaintiffs must meet each of these four requirements before the Court can issue a preliminary injunction. Applying these well-established principles to the facts of this case, I conclude that Plaintiffs have established sufficient evidence in support of each of these four elements, and therefore, Plaintiffs are entitled to a preliminary injunction.

## VI. ANALYSIS

*A. Applicable Case Law*

1. Summary of the First Amendment Constitutional Issues Involved

This case started upon the complaint of one parent at Marjory Stoneman Douglas Elementary School who requested that one book, *Vamos a Cuba*, and its English counterpart, be removed from the school library. The issues pertinent to this complaint do not intrude into the classroom, or into the compulsory or elective courses taught there. They do not involve the rights of students or others to speak in a school's "created" public forum or in its nonpublic forum. They do not involve textbooks or any books which students are required to read in any class or for any class. On the contrary, the only books in contention in this case are *library* books, books that are by their nature optional rather than required reading.

Furthermore, even as to library books, the action before the Court does not involve the *acquisition* of books. The Plaintiffs here have not sought to compel the School Board to *add* to the school libraries' shelves any books that students desire to read. Rather, the action challenged in this case, like in *Island Trees Union Free School District v. Pico*, 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982), is the *removal* from school libraries of books originally placed there by school authorities, or without objection from them.

This case is unique because, instead of addressing a high school level book involving vulgar language and inappropriate sexual references, or dealing with questionable educational themes, the library books in contention are written in a simple manner for young elementary school children and provide superficial introductions about how people live their lives in foreign countries.[18] The heart of the argument is that the Cuba Books omit the harsh truth about totalitarian life in Communist Cuba. It is the view of a majority of the School Board

---

18. One published journal providing reviews of children's literature describes the Cuba Books in this way: "These books offer superficial introductions to geography, people, customs, language, and daily life." (Plaintiffs' Exhibit 18).

members that the Cuba Books (and as an aside, all other books in the Series) should be banned because they believe their neutral view-point is too favorable to Communist Cuba.

Thus, in terms of constitutional analysis, the issue before the Court, like in *Pico*, is a narrow one. First, what limitations, if any, does the First Amendment impose upon the discretion of the School Board to remove these library books from the Miami–Dade County school libraries? Second, for purposes of a preliminary injunction, has the School Board exceeded those limitations? In this Order, I first address the First Amendment issue under the United States Supreme Court and Eleventh Circuit case law. I next apply the case law to the record on preliminary injunction and conclude that the School Board has exceeded First Amendment limitations.

2. Analysis of Supreme Court Case Law On First Amendment Removal Issue

■■■ An analysis of the applicable Supreme Court case law is important in determining which "test" applies to this case. This is because: "First amendment doctrines are manifold, and their diverse facts and analyses may reveal but one consistent truth with respect to the amendment—each case is decided on its own merits." *Bishop v. Aronov*, 926 F.2d 1066, 1071 (11th Cir.1991).

The Supreme Court has long recognized that local school boards have broad discretion in the management of school affairs. *See, e.g., Meyer v. Nebraska*, 262 U.S. 390, 402, 43 S.Ct. 625, 627, 67 L.Ed. 1042 (1923); *Pierce v. Society of Sisters*, 268 U.S. 510, 534, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925). *Epperson v. Arkan.*, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968) reaffirmed that, by and large, "public education in our Nation is committed to the control of state and local authorities," and that federal courts should not ordinarily "intervene in the resolution of conflicts which arise in the daily operation of school systems." *Tinker v. Des Moines Indep. School Dist.*, 393 U.S. 503, 507, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969), noted that we have "repeatedly emphasized . . . the comprehensive authority of the States and of school officials . . . to prescribe and control conduct in the schools." The Supreme Court has also acknowledged that public schools are vitally important "in the preparation of individuals for participation as citizens," and as vehicles for "inculcating fundamental values necessary to the maintenance of a democratic political system." *Ambach v. Norwick*, 441 U.S. 68, 76–77, 99 S.Ct. 1589, 1594, 60 L.Ed.2d 49 (1979). Therefore, in *Pico*, the Court confirmed its full agreement that local school boards must be permitted " 'to establish and apply their curriculum in such a way as to transmit community values,' " and that " 'there is a legitimate and substantial community interest in promoting respect for authority and traditional values be they social, moral, or political.' " *Pico*, 457 U.S. at 864, 102 S.Ct. 2799 (citation omitted).

At the same time, the Supreme Court has necessarily recognized that the discretion of the states and local school boards in matters of education must be exercised in a manner that comports with the transcendent imperatives of the First Amendment. *Pico*, 457 U.S. at 863–864, 102 S.Ct. at 2807; *Tinker*, 393 U.S. at 511, 89 S.Ct. at 736 ("In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate."); *Epperson*, 393 U.S. 97 at 103–105, 89 S.Ct. at 270; *West Virginia Board of Education v. Barnette*, 319 U.S. 624, 637–38, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943) ("If there is any fixed star in our

constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion .... If there are any circumstances which permit an exception, they do not now occur to us."); *Keyishian v. Board of Regents*, 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967) ("The First Amendment ... does not tolerate laws that case a pall of orthodoxy over the classroom.").

Indeed, it has been long recognized that students in the public schools do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506, 89 S.Ct. at 736, and " ... therefore local school boards must discharge their 'important, delicate, and highly discretionary functions' within the limits and constraints of the First Amendment." *Pico*, 457 U.S. at 865, 102 S.Ct. at 2807. With regard to school libraries, the Supreme Count's plurality, in *Pico*, stated: "The special characteristics of the school library make that environment especially appropriate for the recognition of the First Amendment rights of students." *Pico*, 457 U.S. at 868, 102 S.Ct. 2799. Similarly, the Sixth Circuit has said the school library is " ... a mighty resource in the free marketplace of ideas." *Minarcini v. Strongsville City School District*, 541 F.2d 577, 582 (6th Cir.1976) (citing *Abrams v. United States*, 250 U.S. 616, 40 S.Ct. 17, 63 L.Ed. 1173 (1919)).

Consistent with these principles, the Plaintiffs urge the Court to follow and apply the Supreme Court's rationale in *Pico* in deciding the First Amendment issues.[19] In *Pico*, no less than seven separate written opinions addressed the issue of whether the members of a board of education could constitutionally remove from a high school and junior high school library, books the board had characterized as " 'Anti–American, Anti–Christian, Anti–Sem[i]tic, and just plain filthy.' " *Pico*, 457 U.S. at 857, 102 S.Ct. at 2801 (citation omitted). A sharply-divided Court voted to affirm the Court of Appeal's decision to remand the case for a determination of the school board's motives. The Supreme Court determined that questions of fact remained regarding "the possibility that the [School Board's] decision to remove the books rested decisively upon disagreement with constitutionally protected ideas in those books, or upon a desire on [the School Board's] part to impose upon the students ... a political orthodoxy to which [the board members] and their constituents adhered." *Id.* at 875, 102 S.Ct. at 2812. A majority of the Court supported this conclusion.[20] However, the Court did not render a majority opinion. Justice Brennan, joined by three Justices, wrote what is commonly referred to as the "plurality" opinion.

The plurality opinion first outlined the nature of the students' First Amendment rights and subsequently concluded that, based on the evidentiary materials in the record, a genuine issue of fact existed as to whether the school officials had exceeded First Amendment limitations on their discretion to remove library books from the schools. The *Pico* plurality stressed the

---

19. In the School Board's "Supplemental Opinion on the Book Review and Removal Process Under Board Rule 6Gx13–6A–1.26 (Instructional Materials and Resources) (Plaintiffs' Exhibit 12, page 6)," the School Board Attorney acknowledged that *Pico* was the "leading case on school board removal of library books ...."

20. Justices Stevens, Marshall, and Blackmun all joined this part of the opinion. Justice White's agreement may be inferred from his concurrence. Justice White's vote to remand for trial implied that he accepted the viability of the plaintiffs' claim that the attempted imposition of orthodoxy was a claim upon which relief could be granted.

"unique role of the school library" as a place where students could engage in voluntary inquiry. *Id.* at 868–69, 102 S.Ct. at 2809 (plurality opinion) (citations omitted). It also observed that "students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding" and that the school library served as "the principal locus of such freedom." *Id.* The *Pico* plurality recognized that the high degree of deference accorded to educators' decisions, regarding curricular matters, diminishes when the challenged decision involves a non-curricular matter. *Id.* at 868–70, 102 S.Ct. at 2809. Emphasizing the voluntary nature of public school library use, the plurality in *Pico* observed that school officials' decisions regarding public school library materials are properly viewed as decisions that do not involve the school curriculum and that are therefore subject to certain constitutional limitations. *Id.* The plurality recognized that " ... the special characteristics of the school library make that environment especially appropriate for the recognition of the First Amendment rights of students." *Id.* at 853, 102 S.Ct. 2799. In rejecting the school officials' claim of absolute discretion to remove books from their school libraries, the *Pico* plurality recognized that students have a First Amendment right to receive information and that school officials are prohibited from exercising their discretion to remove books from school library shelves "simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Id.*

at 872, 102 S.Ct. at 2810 (citing *Barnette,* 319 U.S. at 642, 63 S.Ct. at 1187).

The *Pico* plurality observed that if school officials intended by their removal decision to deny students access to ideas with which the school officials disagreed, and this intent was the decisive factor in the removal decision, then the school officials had "exercised their discretion in violation of the Constitution." *Id.* The *Pico* plurality explained that a "decisive factor" was one that was a "substantial factor" in the absence of which the opposite decision would have been reached. *Id.* at 871 n. 22, 102 S.Ct. at 2810 n. 22 (citing *Mt. Healthy City School Dist. Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977)). The Court in its plurality opinion implicitly recognized, however, that an unconstitutional motivation would not be demonstrated if the school officials removed the books from the public school libraries based on a belief that the books were "pervasively vulgar" or on grounds of "educational suitability." *Id.* at 870–72, 102 S.Ct. at 2810.[21]

As summarized by the plurality, " ... we hold that local school boards may not remove books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.' Such purposes stand inescapably condemned by our precedent." *Id.* at 872, 102 S.Ct. at 2810 (citation omitted). Explaining that while local school boards possess significant discretion to determine the content of their school libraries, " ... that discretion may not be

---

21. In pointing to distinctions between impermissible and permissible motives, Justice Brennan did not elaborate on how the courts are to define and ascertain the difference between an intent to suppress ideas and an intent to remove books because they are educationally unsuitable. Justice Blackmun, in

his concurring opinion, agreed with Justice Brennan that school boards may not deny access to an idea simply because school board officials disapprove of that idea for partisan or political reasons. *Id.* at 879, 102 S.Ct. at 2804.

exercised in a narrowly partisan or political manner." *Id.* at 871, 102 S.Ct. at 2810. By way of example, the plurality stated: "If a Democratic school board, motivated by party affiliation, ordered the removal of all books written by or in favor of Republicans, few would doubt that the order violated the constitutional rights of the students denied access to those books. The same conclusion would surely apply if an all-white school board, motivated by racial animus, decided to remove all books authored by blacks or advocating racial equality and integration. Our Constitution does not permit the official suppression of ideas." *Id.* at 870–71, 102 S.Ct. at 2810.

The Supreme Court next considered those evidentiary materials which raised genuine issues of material fact concerning whether the school board exceeded constitutional limitations in exercising their discretion to remove the books from the school libraries. Of significant weight was that in making its decision, the school board did not employ established, regular, and facially unbiased procedures for the review of the controversial materials. Instead, the school board ignored the "advice of library experts," the views of "librarians and teachers within the Island Trees School system," the advice of the Superintendent of Schools, and the guidance of publications that rate books for junior and senior high school students. Nor did the school board undertake an independent review of other books in the school libraries. In sum, ". . . some of the evidentiary materials presented . . . do not rule out the possibility that the [school board's] removal procedures were highly irregular and ad hoc-the antithesis of those procedures that might tend to allay suspicions regarding petitioners' motivations." *Id.* at 875, 102 S.Ct. at 2812. The plurality found significant that the evidence ". . . plainly does not foreclose the possibility that the [school board's] decision to remove the books rested decisively upon disagreement with constitutionally protected ideas in those books, or upon a desire on the [school board's] part to impose upon the students of the Island Trees High School and Junior High School a political orthodoxy to which the [school board] and their constituents adhered." *Id.* at 875, 102 S.Ct. at 2812.[22]

---

22. In a concurring opinion, Justice Blackmun focused not on the right to receive information recognized by the plurality, but on the school board's discrimination against disfavored ideas. Justice Blackmun explicitly recognized that *Pico's* facts invoked two significant, competing interests: the inculcative mission of public high schools and the First Amendment's core proscription against content-based regulation of speech. *Id.* 457 U.S. at 876–79, 102 S.Ct. at 2812–14 (Blackmun, J., concurring). Justice Blackmun noted that the State must normally demonstrate a compelling reason for content-based regulation, but that a more limited form of protection should apply in the context of public high schools. *Id.* at 877–78, 102 S.Ct. at 2813. Balancing the two principles, Justice Blackmun agreed with the plurality that the school board could not remove books based on mere disapproval of their content but could limit its collection for reasons of education suitability or budgetary constraint. *Id.* at 879, 102 S.Ct. at 2814.

The four spirited dissents prompted by the facts in *Pico* each focused on the school board's duty to " 'inculcat[e] fundamental values necessary to the maintenance of a democratic political system,' " *id.* at 889, 102 S.Ct. at 2819 (quoting *Ambach v. Norwick*, 441 U.S. 68, 74, 99 S.Ct. 1589, 1595, 60 L.Ed.2d 49 (1979)), and the broad discretion needed properly to carry out that responsibility. The dissenters believed that the plurality's decision would trigger an improper arrogation of the school board's power to the courts. For example, Chief Justice Burger declared that, "[u]ltimately the federal courts will be the judge of whether the motivation for book removal was 'valid' or 'reasonable.' . . . Discretion must be used, and the appropriate body to exercise that discretion is the local elected school board, not judges." *Id.*, at 890–91, 102 S.Ct. at 2820. Justice Powell

The Eleventh Circuit has not yet had the opportunity to directly address and apply *Pico*,[23] although the Fifth Circuit has done so in *Campbell v. St. Tammany Parish School Board*, 64 F.3d 184 (5th Cir. 1995), a case which involved a First Amendment challenge to the removal of a book from all of the public school libraries in St. Tammany Parish, Louisiana. The Fifth Circuit stated that even though the constitutional analysis in the *Pico* plurality opinion does not constitute binding precedent, it may properly serve as guidance in determining whether the School Board's removal decision was based on unconstitutional motives.[24] *Id.* at 189. The Fifth Circuit reasoned that the Supreme Court has previously stated that, in cases in which there is no clear Supreme Court majority, courts should look to "that posi-

similarly noted that "[t]he plurality opinion today rejects a basic concept of public school education in our country: that the States and locally elected school boards should have the responsibility for determining the educational policy of public schools." *Id.* at 893, 102 S.Ct. at 2821–22. Justice Rehnquist likewise stated, "when [the government] acts as an educator, at least at the elementary and secondary school level, the government is engaged in inculcating social values and knowledge in relatively impressionable young people.... [A]ctions by the government as educator do not raise the same First Amendment concerns as actions by the government as sovereign." *Id.* at 909–10, 102 S.Ct. at 2829–30. Similarly, Justice O'Connor agreed that "the plurality's analysis overlooks the fact that in this case the government is acting in its special role as educator." *Id.* at 921, 102 S.Ct. at 2835. The dissenters in *Pico* made no contention that the First Amendment did not encompass the right to receive information and ideas, but merely argued that the students could not freely exercise this right in the public school setting in light of the countervailing duties of the school board. Justice Rehnquist's opinion highlighted the source of contention when he declared: "The libraries of [elementary and secondary] schools serve as supplements to this inculcative role. Unlike universities or public libraries, elementary and secondary schools are not designed for freewheeling inquiry; they are tailored, as the public school curriculum is tailored, to the teaching of basic skills and ideas." *Id.* at 915, 102 S.Ct. at 2832 (emphasis supplied).

**23.** But see dicta in *Virgil v. School Board of Columbia County, Florida*, 862 F.2d 1517, 1523 n. 8 discussed below.

**24.** The Fifth Circuit remanded the cause for trial because it did not have a "full picture" of the reasons why the School Board members constituting the majority voted to remove *Voodo & Hoodoo* from all of the parish public school libraries. 64 F.3d at 190. The Fifth Circuit did, however, comment on the evidence that was before it by way of summary judgment *in a manner which is significant here*. The Court stated: "Although our examination of the summary judgment evidence ultimately leads us to remand the instant case for further development of the record, we are moved to observe that, in light of the special role of the school library as a place where students may freely and voluntarily explore diverse topics, the School Board's non-curricular decision to remove a book well after it had been placed in the public school libraries evokes the question whether that action might not be an unconstitutional attempt to "strangle the free mind at its source." That possibility is reinforced by the summary judgment evidence indicating that many of the School Board members had not even read the book, or had read less than its entirety, before voting as they did; many had done nothing more than browse through the book, while others had read only the several excerpts selected and furnished by a representative of the Louisiana Christian Coalition. Moreover, we note that the School Board's failure to consider, much less adopt, the recommendation of the two previous committees to restrict the Book's accessibility to eighth-graders with written parental permission but to leave the Book on the library shelf-in apparent disregard of its own outlined procedures—has the appearance of "the antithesis of those procedures that might tend to allay suspicions regarding [the School Board's] motivations." The circumstances surrounding the School Board's vote to remove the Book cannot help but rise questions regarding the constitutional validity of its decision." *Id.* at 189–90.

tion taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977); *Gregg v. Georgia,* 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859 (1976). The Fifth Circuit stated that Justice White's concurrence in *Pico* represents the narrowest grounds for the result in that case, and it does not reject the plurality's assessment of the constitutional limitations on school officials' discretion to remove books from a school library. *Campbell,* 64 F.3d at 189. The concurrence merely states that the procedural posture of the case did not require addressing the constitutional questions presented because a material issue of fact existed, precluding summary judgment. *Pico,* 457 U.S. at 882–86, 102 S.Ct. at 2816–17 (White, J., concurring in the judgment).[25]

Subsequent to *Pico,* the Supreme Court decided *Hazelwood School District v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 S.Ct. 2799, 73 L.Ed.2d 435; *see Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 756, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) ("Freedom of speech presupposes a willing speaker. But where a speaker exists, as is the case here, the protection afforded is to the communication, to its source and to its recipients both.") (right to receive advertising). The second involves the students' rights to receive a broad range of information so that they can freely form their own thoughts: "[m]ore importantly, the right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom." 457 U.S. at 867, 102 S.Ct. 2799, 73 L.Ed.2d 435 (emphasis added). The Supreme Court has long recognized that the freedom to receive ideas, and its relation to the freedom of expression, is particularly relevant in the classroom setting: The classroom is peculiarly "the marketplace of ideas." The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth "out of a multitude of tongues, [rather] than through any kind of authoritative selection." *Keyishian v. Board of Regents of Univ. of State of N.Y.,* 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (quoting *United States v. Associated Press,* 52 F.Supp. 362, 372 (S.D.N.Y.1943)). *Id.; see also Pratt v. Indep. Sch. Dist. No. 831,* 670 F.2d 771, 779 (8th Cir.1982) (recognizing "chilling effect" of removing films from school curriculum, which clearly indicated that ideas contained in films were unacceptable and should not be discussed or considered).

---

**25.** The Third Circuit held a broader view of the *Pico* plurality decision in *Kreimer v. Bureau of Police for Town of Morristown,* 958 F.2d 1242, 1255 (3d Cir.1992) ("Our review of the Supreme Court's decisions confirms that the First Amendment does not merely prohibit the government from enacting laws that censor information, but additionally encompasses the positive right of public access to information and ideas. *Pico* signifies that, consistent with other First Amendment principles, the right to receive information is not unfettered and may give way to significant countervailing interests. At the threshold, however, this right, first recognized in *Martin[ v. City of Struthers, OH,* 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1932)] and refined in later First Amendment jurisprudence, includes the right to some level of access to a public library, the quintessential locus of the receipt of information.").

Likewise, the Ninth Circuit relied on a broad view of *Pico* in *Monteiro v. Tempe Union High School District,* 158 F.3d 1022, 1027 n. 5 (9th Cir.1998). That court stated:

We find *Pico* to be particularly helpful in identifying the First Amendment interests that are involved in this case. *Pico* held that a school board could not remove books from a school library if it did so "in a narrowly partisan or political manner." 457 U.S. at 870–71, 102 S.Ct. 2799, 73 L.Ed.2d 435. It based its decision on two First Amendment principles that we find are also relevant in the context of a school curriculum. The first is the well-established rule that the right to receive information is an inherent corollary of the rights of free speech and press, because the right to distribute information necessarily protects the right to receive it. 457 U.S. at 866, 102

L.Ed.2d 592 (1988). In *Hazelwood*, students sued when the principal refused to publish several articles in a school newspaper. *Id.* at 262, 108 S.Ct. at 565. In upholding the school's actions, the Supreme Court held that educators may exercise control over student expression in a curricular program if the restrictions are "reasonably related to legitimate pedagogical concerns." 484 U.S. at 273, 108 S.Ct. at 571. The concern was whether the First Amendment required a school to tolerate particular student speech. At issue was educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents and members of the public might reasonably perceive to bear the imprimatur of the school. The Supreme Court stated that these activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impact particular knowledge or skills to student participants and audiences. *Id.* at 570, 108 S.Ct. 562.

The *Hazelwood* decision was authored by Justice White who had narrowly concurred in *Pico*. The majority opinion in *Hazelwood*, however, did not refer or cite to *Pico*. Presumably, that is because the issues involved were totally different in the sense that *Hazelwood* was a "student speech" case, while *Pico* dealt with removal of books from a school library. Nonetheless, the question remains whether, under the more lenient *Hazelwood* test,

school boards would not offend the First Amendment by exercising control over certain books in school libraries so long as their actions are reasonably related to legitimate pedagogical concerns. A review of the Eleventh Circuit case law, however, demonstrates that the *Hazelwood* test has not been so expanded where non-curricular books are at issue and where, even under the *Hazelwood* standard, the school officials' actions were motivated by a disagreement with the views expressed in the books as compared to pedagogical concerns relating to vulgarity and sexuality.

■ Based on its dicta, I conclude that the Eleventh Circuit would be guided by the *Pico* plurality decision if it is clearly demonstrated that the majority of the School Board's opposition to the content of ideas expressed in the banned books was the "decisive factor" underlying the decision to remove. In my view, the Eleventh Circuit would conclude that the removal of books from school libraries implicates the First Amendment where the books have become controversial simply because the majority of School Board members disagreed with their content, or point-of-view, or because those members desired to impose upon their students a political orthodoxy to which they and their constituents adhered.[26] Simply put, as stated in *Pico*, school officials cannot remove books "simply because they dislike the ideas contained in those books ...." *Pico*, 457 U.S. at 872, 102 S.Ct. at 2810 (plurality opinion).

---

**26.** The School Board Attorney advised the School Board that: "... the more lenient *Hazelwood* standard applies to school boards' decisions to remove books, at least when the removal is from the curriculum, including optional readings in an elective course and it could be argued that it should apply to removal from school libraries, as those books are often deemed 'instructional materials,' and one factor in *Hazelwood* relevant to the determination of whether an activity could fairly be characterized as part of the curriculum is whether 'the public might reasonably perceive [the activity] to bear the imprimatur of the school.'" The School Board Attorney concluded: "Still, it is safer to use the *Pico* standard, as it related directly to removal of library books." (Plaintiffs' Exhibit 12, page 6).

Furthermore, I conclude that the Eleventh Circuit would follow *Pico* in considering whether school officials followed regular procedures when deciding whether to remove books from libraries. This requirement increases the likelihood that legitimate reasons would predominate in deliberations. This is not to say that mere violation of designated procedures violates the First Amendment. But, irregular procedures may substantiate the existence of illegitimate motivations in order to state a claim under *Pico*. Given the existence of irregular procedures, the Eleventh Circuit would likely follow the Fifth Circuit's rationale in *Campbell v. St. Tammany Parish School Board* that: "the School Board's decision to remove the books must withstand greater scrutiny within the context of the First Amendment than would a decision involving a curricular matter," and, as such, following *Pico*, the "key inquiry in a book removal case is the school officials' substantial motivation in arriving at the removal decision." 64 F.3d 184, 189–90 (5th Cir.1995).

### 3. Eleventh Circuit Case Law

In *Virgil v. School Board of Columbia County, Florida,* 862 F.2d 1517 (11th Cir. 1989), the Eleventh Circuit upheld application of *Hazelwood's* "legitimate pedagogical concerns" test to the school board's decision to discontinue use of a humanities textbook from an elective high school class because of optional reading material included in the text that it deemed sexual and vulgar. In that case, the Court confronted the question of " . . . whether the first amendment prevents a school board from removing a previously approved textbook from an elective high school class because of objections to the material's vulgarity and sexual explicitness." *Id.* at 1518.

Of consequence, in addressing this issue, the Court emphasized two important points which are not at issue here. First, the decision at issue involved curricular matters. The Court recognized that, "[i]n matters pertaining to the curriculum, educators have been accorded greater control over expression than they may enjoy in other spheres of activity." *Id.* at 1520 (citing *Hazelwood,* 484 U.S. at 268–70, 108 S.Ct. 562). The materials removed were part of the textbook used in a regularly scheduled course of study in the school. The plaintiffs argued that the materials removed not only were part of an elective course, but were optional, not required reading. The Court, however, concluded that the optional readings removed were part of the school curriculum. It stated:

> Plaintiffs further point out that the materials removed in this case not only were part of an elective course, but were optional, not required readings. For the reasons just mentioned, we conclude that the optional readings removed in this case were part of the school curriculum. Just as elective courses are designed by school officials to supplement required courses, optional readings in a particular class are carefully selected by the teacher as relevant and appropriate to supplement required readings in order to further the educational goals of the course. This is especially true in the instant circumstances, where the optional readings were included within the text itself, and thus had to accompany the student every time the text was taken home. Such materials would obviously carry the imprimatur of school approval.

*Virgil,* 862 F.2d at 1522.

In discussing the application of the *Hazelwood* standard, the Court, in a footnote, stated, by way of dicta, that, "We need not in this case address the validity of school action to remove a book from a separate

outside reading list." *Id.* at 1522 n. 5. Nonetheless, it further stated:

Assuming arguendo that the *Hazelwood* standard would apply because the scope of curriculum design would include not only required readings but also the selected additional readings which are relevant and appropriate to accomplish the overall goal for the course, the distinction between optional readings which are merely on a separate, outside reading list might affect the application of the *Hazelwood* reasonableness test. For example, **it might be easier to make such separate, outside readings subject to parental approval, or otherwise limit the imprimatur of school approval.**

*Id.* (emphasis added).

The Eleventh Circuit's dicta deals with the *Hazelwood* concern that the indicia of school sponsorship increase the likelihood of erroneous attribution to the school, and that school board members may therefore have a legitimate interest in dissociating themselves with the content of the book. But, as noted by the Eleventh Circuit, even where books are on a "separate outside reading list," and, therefore, within the scope of the curriculum design, less onerous remedies than "book banning" can be narrowly tailored to avoid implicating the First Amendment. The "narrowly tailoring" requirement is mandated by Supreme Court precedent. " '[E]ven though the governmental purpose be legitimate and substantial that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Keyishian,* 385 U.S. at 602, 87 S.Ct. at 683 (quoting *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960)); *Sabel v. Stynchcombe,* 746 F.2d 728, 730 (11th Cir.1984). Here, the School Board did not even consider "narrowly tailoring" the use of the books at issue.

The second consideration in *Virgil,* which is not applicable here, is "the fact that the motivation for the Board's removal of the readings ha[d] been **stipulated** to be related to the explicit sexuality and excessively vulgar language in the selections." *Virgil,* 862 F.2d at 1522-23 (emphasis added). While the Eleventh Circuit recognized that "courts have not hesitated to look beyond the stated reasons for school board actions," *id.* at 1523 n. 6, it determined it was clear that the stipulated motivation, from *Hazelwood* and other cases, ". . . is a legitimate concern." *Id.* at 1523. Citing *Hazelwood,* the Eleventh Circuit held that school officials can " 'take into account the emotional maturity of the intended audience in determining . . . [the appropriateness of] potentially sensitive topics' " such as sex and vulgarity. *Id.* (quotations and citations omitted). Here, the School Board does not contend that the children's books at issue involve sensitive topics such as sex and vulgarity. But, even where the stipulated motivation of the School Board relates to legitimate concerns, it is still necessary to determine "whether the Board action was *reasonably* related thereto." *Id.; cf. Searcey v. Harris,* 888 F.2d 1314, 1319 (11th Cir.1989) ("Since the purpose of a curricular program is by definition 'pedagogical,' the *Cornelius* standard requires that the regulations be reasonable in light of the pedagogical purposes of the particular activity.") (citing *Cornelius v. NAACP Legal Defense & Educ. Fund,* 473 U.S. 788, 809, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)). In assessing the reasonableness of the board's actions, the Eleventh Circuit, besides focusing on the fact that a substantial number of students had not reached the age of majority, noted that "disputed materials have not been banned from the school," *Virgil,* 862 F.2d at 1525, and that

(of considerable importance here), "The *Humanities* textbook and other adaptations of *Lysistrata* and *The Miller's Tale* are available in the school library. No student or teacher is prohibited from assigning or reading these works or discussing the themes contained therein in class or on school property." *Id.*

For these reasons, the Eleventh Circuit found *Board of Education v. Pico* to be inapplicable, even though the Plaintiffs/Appellants argued that the facts were most analogous to the removal of books from a library. In a footnote which is significant to this case, the Eleventh Circuit, based on the stipulated reasons for the board's actions, found the motive at issue in *Pico* to be absent. Moreover, the Eleventh Circuit left open the appropriate standard to be applied in a case where one party has demonstrated that the removal stemmed from opposition to the "ideas contained in the disputed materials." The Court stated:

> Appellants argue that this case is most analogous to the removal of books from a library, and thus that it is governed by *Board of Education v. Pico.* We disagree. *Pico* involved a school library, and the plurality took special note of the "unique role of the school library" as a repository for "voluntary inquiry." More significantly, the *Pico* plurality held that a school board may not remove books from a school library where a constitutionally impermissible motive—**board members' opposition to the content of ideas expressed in the disputed materials—was the "decisive factor" underlying the decision to remove.** By virtue of the parties' stipulated reasons for the Board action in this case, the motive at issue in *Pico* is absent here. **We make no suggestion as to the appropriate standard to be applied in a case where one party has demonstrated that removal stemmed from**

**opposition to the ideas contained in the disputed materials.**

*Id.* at 1524 n. 8 (emphasis added) (internal quotations and citations omitted).

Subsequent to *Virgil,* the Eleventh Circuit, in *Searcey v. Harris,* 888 F.2d 1314 (11th Cir.1989), rejected the school board's argument, in that case, that *Hazelwood* does not prohibit school officials from engaging in "viewpoint based" discrimination. In *Searcey,* a peace organization brought suit challenging the school board's denial of their request to present certain information to public high school students during "career day." The School Board argued that *Hazelwood* changed the First Amendment analysis applied to school officials' decisions relating to curricular programs. In discussing *Hazelwood,* the Eleventh Circuit again emphasized the Supreme Court's holding that educators may exercise control over student expression in a curricular program if the restrictions are "reasonably related to legitimate pedagogical concerns." The Court went on to state, however, "We fail to see how this standard differs from the *Cornelius* standard for nonpublic forums; instead it is merely an application of that standard to a curricular program." *Id.* at 1319. The Court emphasized that *Hazelwood* involved a **content based** distinction: the principal decided that the subject of teenage sexuality was inappropriate for some of the younger students. There was no indication that the principal was motivated by a disagreement with the **views** expressed in the articles. *Id.* at 1324–1325. Of importance, the Eleventh Circuit stated:

> The Board argues that *Hazelwood* does not prohibit school officials from engaging in viewpoint based discrimination. **We disagree.** *Hazelwood* involved a content based distinction; the principal decided that the subject of teenage sexu-

ality was inappropriate for some of the younger students. There was no indication that the principal was motivated by a disagreement with the views expressed in the articles. Although *Hazelwood* provides reasons for allowing a school official to discriminate based on *content*, **we do not believe it offers any justification for allowing educators to discriminate based on viewpoint.** The prohibition against viewpoint discrimination is firmly embedded in first amendment analysis. **Without more explicit direction, we will continue to require school officials to make decisions relating to speech which are viewpoint neutral.**

*Id.* at 1324–1325 (emphasis added in bold) (internal citations omitted).[27]

### 4. School Board Response

The School Board first argues that *Pico* has no precedential value and, to the degree that the seven different opinions of the Justices retain any prescriptive value, they militate in favor of the School Board's decision to remove the book. Second, it argues that the books removed were so rife with material omissions of basic facts, and are so misleading as to present a false view of the countries as a matter of fact, that their removal would be justified under Justice Brennan's "educational suitability test." Third, it argues that under the **subsequently** adopted *Hazelwood* test, removal would be proper if the school library **selection** process were regarded as "school sponsored speech" because the replacement of such inaccurate books is "reasonably related to a legitimate pedagogical concern." Finally, it argues that under the contemporary First Amendment precedent of the United States Supreme Court and the Eleventh Circuit, citing the Eleventh Circuit decision in *Bannon v. School District of Palm Beach County*, 387 F.3d 1208 (11th Cir.2004), that the selection and removal of elementary school library books, at least under the system adopted by the School Board is clearly a "curricular function" in a nonpublic forum that constitutes "government speech," which implicates no First Amendment rights. None of these arguments have merit. I discuss the first three arguments later in this Order but I address the last argument now.

---

**27.** In addressing *Hazelwood,* the Eleventh Circuit further commented:

> Although the *Hazelwood* Court concluded that school officials should have great control over curricular expression, that discussion was intended to exempt student expression in a curricular activity from the more stringent standard applied to student speech in noncurricular activities enunciated in *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). In *Tinker*, the court held that a school may not prohibit student expression unless it will materially disrupt the operation of the school. *Id.* at 509, 89 S.Ct. at 738. Therefore the emphasis in *Hazelwood* on control over curricular expression was intended to distinguish the case from *Tinker* and justify the application of the *Cornelius* standard. *Hazelwood*, 484 U.S. at 271, 108 S.Ct. at

570; *see Alabama Student Party v. Student Government Ass'n*, 867 F.2d 1344, 1345 (11th Cir.1989) (*Cornelius* standard applicable to situation where outsiders seek access to school).

> Of somewhat more concern is the suggestion by the School Board that *Hazelwood* eliminates the requirement that restrictions on speech in a curricular activity be viewpoint neutral. Although the Supreme Court did not discuss viewpoint neutrality in *Hazelwood*, there is no indication that the Court intended to drastically rewrite First Amendment law to allow a school official to discriminate based on a speaker's views. As discussed, *supra*, Hazelwood acknowledges a school's ability to discriminate based on *content* not *viewpoint*.

*Searcey*, 888 F.2d at 1324–25 (emphasis in original).

The *Bannon* case cited as controlling authority by the School Board is not on point. It was a "student free speech case" where the school district and school principal required the student to remove religious words and symbols from murals painted for a school beautification project. *Id.* at 1211. The Eleventh Circuit affirmed the summary judgment order of the district court that the School District and Principal never created a public forum, the murals were school-sponsored speech and their response was reasonably related to legitimate pedagogical objectives. *Id.* at 1217. From this limited set of facts, which are totally unrelated to the facts and issues in this case, the School Board makes the "leap" that: "Obviously, the selection of school library books, and their removal by school authorities, by applying the same standards for textbooks, constitutes 'government speech.'" The School Board's analysis is based on a number of faulty premises. It first argues that the removal of books in elementary school libraries clearly constitutes a "nonpublic forum" because the process is not "open to public participation." (Defendants' Initial Memorandum of Law in Opposition to Motion for Preliminary Injunction, page 12 n. 3). This contention is clearly wrong and is directly contrary to the reality of what transpired before the SMRC, the DMRC and the School Board itself on April 18, 2006 in which extensive public debates and public participation were permitted. (Plaintiffs' Exhibits 5, 7, 10, 22, and 33).

Next, the Eleventh Circuit made it clear that: "*Hazelwood* controls all expression that (1) bears the imprimatur of the school, and (2) occurs in a curricular activity, but

conclude that Shararh's murals occurred in such a curricular context. Thus, the murals constituted school-sponsored expression within the meaning of *Hazelwood.*" *Bannon,* 387 F.3d at 1214 (citations omitted). In addressing the question of whether the student's mural expression occurred in the context of a "curricular activity," the Eleventh Circuit stated that: "To be considered curricular, expressive activities need not occur in a 'traditional classroom setting.' Instead, expressive activities are curricular so long as they are merely (1) 'supervised by faculty members,' and (2) 'designed to impart particular knowledge or skills to student participants and audiences.'" *Id.* (internal citations omitted).

Unlike the situation in *Bannon,* we do not have a circumstance where the principal or any other faculty member was "sponsoring" or "supervising" a school project relating to the Cuba Books. Instead, we are dealing with an elementary school library at Marjory Stoneman Douglas Elementary School where only **three** copies of the Cuba Books were in the library circulation system and were acquired in 2001, 2003 and 2004. The remaining copies were within the other school libraries [49 copies in 33 schools acquired from 2001 to 2006]. Obviously, only a very limited number of students would have access to the Cuba Books at any one time.[28]

There is no evidence in this record that these books, other than remaining on the library shelves, were part of any school project that allowed student participants [namely those who may have checked out the book] to express themselves artistically or to appreciate how other students felt

---

**28.** The Minutes of the DMRC Meeting of May 22, 2006 show that Mr. Pimienta (Defendant's witness) provided information to the DMRC that the book series "is located in the 900 section under Non–Fiction (History, Geography, Cultures), and it is not a reference book." (Plaintiffs' Exhibit 7, Minutes at 4). The SMRC recommendation of April 19, 2006 described the status of the Cuba Books as "part of the collection of titles available in the Media Center at Marjory Stoneman Douglas Elementary School." (Plaintiffs' Exhibit 10).

about the book. There was no evidence at the preliminary injunction hearing that the Cuba Books were purchased as textbooks or assigned by any classroom teacher to any student for any classroom project or as optional reading, or that any student checked out the Cuba Books for use in conjunction with any classroom or school project. Nor do we have a situation where the Cuba Books were assigned to anyone for use in a regular scheduled course of study under the supervision of any faculty member. Therefore, there is no indicia of "curriculum" which bears the imprimatur of the school or the School District. The mere purchase of a few books which essentially remained on the library shelves over a period of several years can hardly be characterized as "curricular" or be argued to reasonably bear the imprimatur of the school.

■ In sum, I conclude that the book removal did not in fact occur in the context of a curricular activity. Even the School Board's Attorney advised the Board that the school library book in question was not "instructional material," but was "...

more representative of books considered 'educational media.'' (Plaintiffs' Exhibit 12, April 28, 2006 memorandum, page 5).[29] This is an important admission which later-hired counsel for the School Board cannot now ignore. Now, after the fact, the School Board attempts, and poorly so, to argue that the books at issue are considered "Instructional Materials" which are an integral part of the curricular process. The mere fact that elementary **school libraries themselves** are used principally to further the curriculum and promote the importance of reading does not mean, without more, that maintaining a few copies of a book on a few library shelves is *per se* "curricular." [30] The Eleventh Circuit has held as much in *Virgil* by stating that materials are curricular if they are "used in a regularly scheduled course of study in the school," and thus the public might reasonably perceive that they "bear the imprimatur of the school." *Virgil*, 862 F.2d at 1521. In discussing what is "curricular," the Eleventh Circuit, in *Virgil*, distinguished between textbooks used in the classrooms and "library books." The Court noted that the disputed materials in

**29.** The School Board Rule recognizes that Library Media Centers are to contain a comprehensive collection of materials to, among other goals: (1) provide a broad background of information resources in all areas of knowledge; (2) support the general educational goals of the District and the objectives of specific courses, including materials that represent diverse points of view in order that young citizens may develop, under guidance, the practice of critical analysis of all media and intellectual integrity in forming judgments; and (3) meet the personal needs and interests of students. (Plaintiffs' Exhibit 6, page 21). It distinguishes Library Media Center materials from Instructional Materials. (Plaintiffs' Exhibits 11 and 12).

**30.** The fact that school libraries, like all libraries, have educational value does not convert every book on the shelves of the school library into curricular texts. Even the School Board's defense witness, Alberto Pimienta,

recognizes that library books "are also used to provide recreational reading materials." (Pimienta Affidavit, ¶ 5). The plurality opinion in *Pico* anticipated this argument. As the *Pico* plurality noted, the school board might well defend its claim of absolute discretion "in matters of *curriculum* .... But we think that [the Board's] reliance upon that duty is misplaced where, as here [it] attempts to extend [its] claim ...beyond the compulsory environment of the classroom, into the school library and the regime of voluntary inquiry." 457 U.S. at 869, 102 S.Ct. at 2809. *Accord Romano v. Harrington*, 725 F.Supp. 687, 690 (E.D.N.Y.1989) ("pedagogic concerns allow educators to exercise more control over the content of students' required reading lists than over their voluntary, extra-curricular selections, even though the voluntary and required selections may exist side-by-side on the school library's shelf.").

that case "have not been banned from the school" and "were available in the school library." *Id.* at 1525. In determining the authority of the school board to remove the curricular materials in the textbook, the Eleventh Circuit referred to the adaptions of *Lysistrata* and *The Miller's Tale* that were in the library, stating: "No student or teacher is *prohibited* from assigning or reading these works or discussing the themes contained therein in class or on school property." *Id.* (emphasis added).

Here, by totally banning the Cuba Books and the rest of the Series, the School Board is in fact prohibiting even the voluntary consideration of the themes contained in the books by students at their leisure. This goes to the heart of the First Amendment issue. Accordingly, for the reasons I have discussed, the situation here bears no relation to "curricular activity," as that term was discussed in *Hazelwood* and *Bannon*.[31] Therefore, I conclude, for preliminary injunction purposes, that the Cuba Books, and the rest of the books in the Series, are not part of any regular or organized school curriculum.[32]

Turning back to the School Board's argument regarding "Governmental Speech," I also find significant that the Eleventh Circuit, in *Bannon*, did not apply such a test in the broad manner advocated by the School Board. To have done so would have simply allowed "unbridled discretion"

without any constitutional constraints. Instead, it applied the *Hazelwood* test, and also reconfirmed its position, as stated in *Searcey*, that "[a]lthough *Hazelwood* provides reasons for allowing a school official to discriminate based *on content*, we do not believe it offers any justification for allowing educators to discriminated based on *viewpoint.*" *Bannon*, 387 F.3d at 1215 (citing to and quoting *Searcey*, 888 F.2d at 1325). The Eleventh Circuit explained that the school, in *Bannon*, "... did not engage in viewpoint discrimination, but rather censored the murals on the basis of their content." 387 F.3d at 1215. The Court reasoned that the message on the murals was inherently religious, which could not be recast as the discussion of secular topics from a religious perspective. *Id.* at 1216. The Court held that since the school did not permit any student in the context of a curricular activity to communicate such messages, it restricted speech on the basis of content, not viewpoint. In contrast, as explained below, the School Board here was concerned with **viewpoint, not content,** that related to life in foreign countries. Accordingly, even under the more lenient *Hazelwood* standard, the School Board's action would be in violation of *Searcey* and *Bannon.*

Of interest, the School Board does not discuss this aspect of *Searcey* and *Bannon.* Instead, it argues that: "The case law is **deeply divided** as to whether *Hazelwood*

---

**31.** In its debate, one School Board member said: "This is not a text book, this is a book in a library that a child may choose or not to take out of the library." [Exhibit 33, page 78].

**32.** Similarly, in *Silano v. Sag Harbor Union Free Sch. Dist.*, 42 F.3d 719 (2d Cir.1994), the Second Circuit considered the use of a film clip by a guest lecturer in a mathematics class. The lecturer argued that "the disputed film clip falls within the heightened protection provided to library resources." With

reasoning pertinent to this case, the Second Circuit rejected this argument, stating: "[T]he distinguishing factor between library resources and curriculum is that library resources are something that students voluntarily may view at their leisure, whereas curriculum is required material for students. Here the students were required to attend mathematics class, their teacher was present, and the purpose was to impart knowledge of how film making relates to mathematics." *Id.* at 723 (internal citations omitted).

requires 'view point neutral' restrictions, while admittedly permitting content-based distinctions, and the distinction between the former and later restraints is unclear." (Defendants' Initial Memorandum of Law in Opposition to Motion for Preliminary Injunction, page 13) (emphasis added). I

conclude that the School Board is wrong. Even the case it relies on, *Chiras v. Miller*, 432 F.3d 606 (5th Cir.2005), specifically recognized that the Eleventh Circuit has split from other circuits on the question of whether *Hazelwood* requires view-point neutrality. *Id.* at 615 n. 27. The case law is not unclear in the Eleventh Circuit [33]

**33.** The School Board appears to argue that it is not even bound by *Hazelwood* because the School Board's **selection** of elementary school library books is "government speech." (Defendants' Initial Memorandum of Law In Opposition to Motion for Preliminary Injunction, page 15). From this point-of-view, it appears to argue that First Amendment constraints do not apply when the Government engages in "Government Speech" because the Government is the literal speaker. In support, it cites *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005). The *Chiras* decision is not on point. The issue addressed was whether Chiras alleged a violation of his First Amendment rights as a textbook author when the board of education declined to place his textbook on the conforming or nonconforming list of textbooks for use in public school classrooms. The Fifth Circuit stated that: "Although the Supreme Court has not answered this question directly, the Court has given us ample guidance to allow us to comfortably answer in the negative." *Id.* at 611. But, this case is not about the author of the Cuba Books attempting to compel the Miami–Dade School Board to place it as a "textbook" for use in elementary school classrooms as part of the curricula. It is about removing a non-curricular book from the school library shelves because the board members did not agree with its point-of-view. It is the Fifth Circuit's earlier case in *Campbell* that is important here, but the School Board choose not to discuss it.

None of the other Supreme Court cases cited by the School Board can be stretched as far as it suggests so as to abrogate the First Amendment by allowing school boards absolute discretion in removing library books because government funds were used in their original purchase or because a school board librarian initially approved their original purchase. None of the cases are factually on point. *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) addressed a claim by an independent political candidate that a state-owned public television broadcaster excluded the candidate from a debate. *National Endowment for Arts v. Finley*, 524 U.S. 569, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) upheld an art funding program that required the NEA to use content based criteria in making funding decisions. *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003) addressed claims that the Children's Internet Protection Act, which required public libraries to use internet filters as a condition for receipt of federal subsidies, violated the First Amendment. The Court found that public library staffs enjoy broad discretion in making "collection" decisions. Again, this case does not involve a "collection" decision. It involves a "removal" decision under a different set of School Board rules.

To argue that every volume on the shelves of a public school library bears the imprimatur of the school and is government speech is directly in conflict with First Amendment limitations. As the District of Columbia remarked in *PETA v. Gittens*, 414 F.3d 23, 28 (D.C.Cir. 2005), "Those who check out a Tolstoy or Dickens novel [from a public library] would not suppose they will be reading a government message." To argue that every book in the library bears a government-endorsed message is patently without merit. The logical extension of the School Board's argument is that it can remove each and every book in the school library for reasons rooted in political orthodoxy simply because a majority of the Board happens to disagree with a book's content-neutral message. It can do it simply because it had the original power to choose. This is precisely the political expungement that every Justice determined violated the First Amendment in *Pico*.

The principle applies equally to the School Board's argument under the "government funding" prong of its reasoning. Essentially, such an argument boils down to "because we bought the book, we have the unfettered discretion to decide to ban it." Such an ideolog-

and the School Board is less than candid with this Court in suggesting otherwise.[34]

In rejecting the School Board's arguments, I follow, in the absence of a binding Eleventh Circuit opinion, the Fifth Circuit's decision in *Campbell v. St. Tammany Parish School Board*, that: "Even though the constitutional analysis in the *Pico* plurality opinion does not constitute binding precedent, it may properly serve as guidance in determining whether the School Board's removal decision was based on unconstitutional motives." 64 F.3d at 189. Confronted with the same issue in a library book removal setting, another district court, in *Case v. Unified School Dist. No. 233*, 908 F.Supp. 864 (D.Kan.1995), recognized that the *Pico* decision is not binding precedent, but, applying the Fifth Circuit's rationale in *Campbell*, concluded (given the absence of Tenth Circuit precedent) that: "This is the only Supreme Court case dealing specifically with the removal of books from a public school library" ... [and] "... it should follow the *Pico* decision in analyzing the Olathe School District's removal of *Annie on My Mind* from the District's libraries." *Id.* at 875.[35] In applying *Pico*, the District Court determined the "actual motivation" of the school board members in their removal

decision. *Id.* The Court stated: "If the decisive factor behind the removal of *Annie on My Mind* was the school board members' personal disapproval of the ideas contained in the book, then under *Pico* the removal was unconstitutional." *Id.* The Board of Education members who voted in favor of the removal stated that they believed the book was "educationally unsuitable." *Id.* Accordingly, the District Judge determined: "The court is required to assess the 'credibility of [school officials'] justifications for their decision." *Id.* (citation to *Pico* omitted).

After a full trial, the district judge concluded that: "[T]here [was] no basis in the record to believe that these Board members meant by 'educational suitability' anything other than their own disagreement with the ideas expressed in the book" and "... the invocation of 'educational suitability' does nothing to counterbalance the overwhelming evidence of view-point discrimination." *Id.* The District Court concluded that the school board members removed the book because they disagreed with the idea expressed in it and that "... this factor was the substantial motivation in their removal decision," and that: "... Defendants unconstitutionally sought to 'prescribe what shall be orthodox in poli-

---

ically-imposed straightjacket directly conflicts with established First Amendment case-law supporting free inquiry. *Keyishian*, 385 U.S. at 603, 87 S.Ct. at 683 (the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom.... The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, (rather) than through any kind of authoritative selection.") (internal citations and quotations omitted).

34. I reject the School Board's argument that the holding of the Fifth Circuit in *Campbell* was "superseded" by *Chiras v. Miller*. The cases analyze different school board actions. *Chiras* is a case about the authority of the Texas State Board of Education to select and

approve *textbooks* for each subject and grade level in the Texas public school system. 432 F.3d at 608. The *Chiras* court did not reject *Campbell's* analysis in the school library setting. To the contrary, *Chiras* explained that "[b]ecause *Pico* addressed the removal of an optional book from the school library, not the *selection of a textbook for use in the classroom*, we decline to apply *Pico* to the facts before us." *Id.* at 619 (emphasis added). Once again, I am concerned that the School Board has been less than candid with the Court in its arguments.

35. The School Board cites Case for standing purposes, but chooses to ignore the District Judge's First Amendment analysis, which is applicable here.

tics, nationalism, religion, or other matters of opinion." *Id.* at 876 (citations to *Pico* omitted). In reaching its conclusion, the District Court took into account: "[T]he highly irregular and erratic manner in which defendants removed *Annie on My Mind* from the District's libraries and their disregard of established policy and procedure [which] are important evidence of their improper motivation." *Id.* (citations to *Pico* omitted).

As discussed below, I follow and apply the District Judge's First Amendment analysis here. Under the guise of "Government Speech," the School Board essentially argues that it has broad discretion to transmit community values, and that it may remove library books based upon their personal, social, political and moral views. The Supreme Court in *Pico* expressly rejected this argument, noting that "petitioners' reliance upon that duty (to transmit community values through curriculum) is misplaced where, as here, they attempt to extend their claim of absolute discretion beyond the compulsory environment of the classroom, into the school library and the regime of voluntary inquiry that there holds sway." *Pico,* 457 U.S. at 869, 102 S.Ct. at 2809.

The arguments now relied upon by the School Board are merely a pretext to provide constitutional cover for the impermissible actions taken. Allowing boards to engage in *post hoc* rationalizations for book-banning permits them to mask impermissibly motivated behavior by plausible but disingenuous justifications. The School Board tries to "bootstrap" itself, applying the *Hazelwood* test, that removal would be proper if the school library **selection** process was regarded as "school sponsored speech" because the replacement of such inaccurate books is "reasonably related to a legitimate pedagogical concern." But, we are not dealing here

with library selection or student speech sponsored by the schools. Here, the invocation of these arguments does nothing to counterbalance the overwhelming evidence, for preliminary injunction purposes, of view-point discrimination whether under the *Pico* or *Searcey/Bannon* tests.

### B. Preliminary Injunction Elements

#### 1. Likelihood of Success on the Merits

Plaintiffs have advanced two basic theories in their Amended Complaint-denial of First Amendment rights and denial of due process. With respect to the First Amendment, the Plaintiffs claim that the School Board's June 14, 2006 Order (the Order), Exhibit 15, directing that the Cuba Books, and the remaining books in the Series, be removed from all libraries within the Miami–Dade County Public School system violates Plaintiffs' First Amendment rights because: (1) it denies them access to information; (2) the removal decision was motivated the School Board and community disapproval of the contents of the books; and (3) the decision of the School Board to remove the books was not content and viewpoint neutral, as is required for removal in such a forum.

Plaintiffs then advance two separate due process claims. First, Plaintiffs claim that the Order denies them due process because it was directed to all 49 copies of the Cuba Books, including those contained in the 32 school libraries other than the Marjory Stoneman Douglas Elementary School, which was the only subject of the administrative proceedings in this matter. Second, Plaintiffs claim that the portion of the School Board's Order directed to the unspecified books "in the series [the Cuba Books are] apart of" were never the subject of an administrative proceedings. Plaintiffs claim that this portion of the Order is also overbroad and not the least restrictive means of accomplishing any

compelling governmental interest. I first address the merit of Plaintiffs' First Amendment claims.

### a. Plaintiffs' First Amendment Claims

▇▇▇▇▇ Under the applicable case law, the School Board may not remove non-curricular books from the school library shelves because a majority of the Board dislikes the ideas or the points-of-view contained in the books and seeks by their removal to prescribe what shall be orthodox in politics, nationalism, or other matters of opinion. For preliminary injunction purposes, I conclude, based on the greater weight of the more persuasive and credible evidence at the preliminary injunction hearing, that the majority of the Miami–Dade County School Board members intended by their removal of the books to deny schoolchildren access to ideas or points-of-view with which the school officials disagreed, and that this intent was the decisive factor in their removal decision. In so acting, the School Board abused its discretion in a manner that violated the transcendent imperatives of the First Amendment.

The political orthodoxy evident from the record is the view held by a majority of School Board members concerning how life in contemporary Cuba should be portrayed in children's books regardless of the educational merit or the age appropriateness of the books. While the debate was couched in terms of "inaccuracies" contained in the Cuba Books, the real issue was that the Cuba Books were content-neutral and scrupulously apolitical, and did not reflect, as viewed by the majority of the School Board members, the true evil of Castro's government and the oppression of the Cuban people. Thus, the majority was significantly motivated to remove the books because of their disagreement with the content-neutral views expressed in the Cuba Books, essentially the view that "People in Cuba eat, play and go to school *like you.*" This statement, however, was apolitical and content-neutral. It was not limited to only the Cuba Books, but can be found, as well, in the Series books about a visit to Puerto Rico, Vietnam, Australia, China, Mexico, India, Ireland, Israel, Italy, Japan, Brazil, Egypt, France, Germany, Greece, and the United Kingdom. Therefore, the question arises, should School Board members who happen to emigrate from any of these countries to the United States be permitted to ban books in the Series because of their individual political orthodoxy and point-of-view of what is "true" for a child's life in one or more of those countries? The obvious answer under constitutional standards is "no." I conclude that the School Board's claim of "inaccuracies" is a guise and pretext for "political orthodoxy." The claim of "inaccuracies" goes to "omission" more than to incorrect or out-of-date assertions affecting educational suitability. Under the School Board's rules, a key component of "accuracy" is "objectivity." [36] The gist of the argument, however, is that the books were too objective and, therefore, should be banned.

The political orthodoxy at issue was best expressed by School Member Frank J. Bolaños, who was the main proponent of the removal. On April 18, 2006, in an effort to ban the books before the School Board Rule's review process was completed, he wrote to other School Board members that; "... *Vamos a Cuba* includes content and pictures [showing smiling children in uniforms] that erroneously depict

---

**36.** The criteria of "accuracy" under the School Board's rules means "[N]onfiction information is correct, recent, and objective."

(Plaintiffs' Exhibit 12, Memorandum of the School Board Attorney, April 28, 2006, page 6).

life in Cuba. This book is hurtful and insulting to both our Cuban–American community and those Cubans still living on the island under oppressive conditions." [Plaintiffs' Exhibit 19].

The point-of-view in *¡Vamos a Cuba!* most offensive to Mr. Bolaños was that: "The people eat, work and study *like you*. Life in Cuba is also unique." (emphasis added). Mr. Bolaños characterized this statement as a "distortion" and stated: "Nothing can be more further than the truth." He wrote: "The people of Cuba survive without civil liberties and due process under the law and receive 10 to 20 year prison sentences for simply writing a document or voicing an opinion contrary to the party line. People are told where to work. They lose their job if they do not follow the dictates of the Communist Party. Children are indoctrinated and forced to chant Castro's greatness in class." *Id.*

As evidenced by a review of the transcripts of the public proceedings, Mr. Bolaños' statements were supported by other School Board members and by a number, but not all, of their constituents.[37] The merit or truth of these statements is not the issue. Nothing written here is intended to cast doubt upon the heartfelt point-of-view expressed by Mr. Bolaños and his supporters. Tragically, that point-of-view is based on real life experiences that members of the Cuban Community and their families have painfully endured in Cuba before coming to this country, and which many who have remained continue to endure under an oppressive totalitarian regime. But, many have come to this nation, and continue to do so today, for the opportunity to live in freedom under the protection of our Constitution and Bill of Rights. The quintessential right of freedom of speech may not be sacrificed on the alter of beliefs no matter how firmly those beliefs are held. In this nation, we do not prohibit the expression of an idea simply because some in the community find it offensive or disagreeable. To ban books because of perceived inaccuracies sweeps too broadly. Too many works of literature could be removed from school libraries based on the degree of accuracy according to School Board members. To do so places at risk the very rights which make this nation great. As one person commented during the debates, "I fear we may become that which we constantly protest against...." [Exhibit 33, page 33].

In defense, the School Board asserts that what is involved is more than mere beliefs but pedagogical community values that it may protect and in which it has a legitimate and substantial community interest in promoting.[38] It points out its right, under its own rules, to determine

37. One of the affidavits filed in support of the Defendant was authored by Dr. Lydia M. Usategui, M.D. (Defendants' App. C). Dr. Usategui testified before the School Board on April 18, 2006 that *¡Vamos a Cuba!* should be banned because "the book tries to portray an image of normalcy with the theme of life growing up in Cuba as very similar to that in the U.S. This is grossly inaccurate and unacceptable." (April Transcript, 27:14–27:17). As Plaintiffs' expert, Dr. Lisandro Perez, stated by way of declaration: "The real offense of *Vamos a Cuba* for many Cuban exiles is that it treats Cuba as if it were any other country. To present Cuba as a normal place is unacceptable to exiles because it negates the very reason for their exile and struggle....The adamant rejection of normalcy accounts for the strong desire to remove from the library shelves a book that treats Cuba as the same as any other country." (Plaintiffs' Exhibit 30, Declaration of Dr. Lisandro Perez, ¶ 9).

38. The School Board argues that the books were removed because they were "rife" with material omissions of basic facts and are so misleading as to present a false view of the countries as a matter of fact, that their removal would be justified even under Justice Brennan's "educational suitability" test.

the educational suitability of library books, especially those written for very young and impressionable elementary school students. No doubt this is true unless it becomes a pretext to justify imposing political orthodoxy and thereby exceeds constitutional limitations.

The duty of this Court is to scrutinize the record to determine which is the decisive factor and the substantial motivation for the School Board's Final Order. Indicia may be found both in the content of the debate and the means of its presentation. Even though the matter is only at the preliminary injunction stage, I am compelled to observe that, in light of the special role of the school library as a place where students may freely and voluntarily explore diverse ideas, the School Board's non-curricular decision to remove the Cuba Books well after they had been placed in only a few of the public school libraries evokes fundamental constitutional concerns. That possibility is enforced by the evidence indicating that the School Board's ultimate action was not to remove one book from one library where one parent raised an issue, but to remove all the Cuba Books from all the libraries and, of significant importance, to remove the remaining nineteen books in the Series when the evidence establishes without contradiction that none of these other books were subjected to the School Board's own review processes or were ever previously questioned on appeal, or were ever read by most of the School Board members prior to their vote.

The broad sweep of the School Board's action lends support to the Plaintiffs' argument that it was constitutionally infirm.

The transcript of the hearing where the Board rejected the Committees' and Superintendent's findings is replete with examples of political decision-making based upon the politics of opposition to the Castro regime in Cuba.[39] One Board member, who voted against the removal of the books, said it this way: "The 22 professional educators who reviewed this books have affirmatively determined that this is not the case [that there were not 'serious, material, irrevocable and clear inaccuracies and biases'], therefore, we are here today in essentially a *political process*," ... and, "[w]e are rejecting the professional recommendation of our staff *based on political imperatives* that have been pressed upon members of this board,..." (Plaintiffs' Exhibit 34, pages 34:23–35: 15) (emphasis added).

Significant weight must be given to the Board's failure to consider, much less adopt, the recommendations of the two previous committees, and that of the School Superintendent, to leave the Cuba Books on the library shelves because they were educationally suitable. These actions have the appearance of "the antithesis of those procedures that might tend to allay suspicions regarding the School Board's motivations." *Campbell*, 64 F.3d at 190–91 (citing *Pico*, 457 U.S. at 875, 102 S.Ct. 2799, and *Keyishian*, 385 U.S. at 604–05, 87 S.Ct. 675 (observing that "[t]he danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform ... what is being proscribed")).

**39.** In his memorandum of May 22, 2006 to the Deputy Superintendent Curriculum Instruction and School Improvement, the Superintendent of Schools stated: "I have listened carefully to the citizens who have come to address the School Board in April and in May, and have been struck by some disturbing signals of intolerance, which left unaddressed could threaten the progress and the harmony that has marked our community over the last decade. Divisive rhetoric only damages the fabric of our society."

To begin with, Mr. Bolaños' immediate desire was to circumvent the appeals process under the Board's own rules by immediately removing *Vamos a Cuba* not only from the school library at Marjory Stoneman Douglas Elementary School, but in all such libraries throughout the School District. He was joined at the Board's meeting held on April 18, 2006 by two other School Board members, one of whom compared the Cuba Books to "pornography" and "books about devil worship." The School Board Attorney warned the Board that such action would be subject to constitutional attack. The motion lost and the review process continued. Notwithstanding, when the matter returned to the School Board for final action, the same infirmity occurred when the Board ignored the advice of its attorney that: "... it was of vital importance that the procedures established by Board Rule be followed strictly. Suspending the applicable Board Rule would not be an available option for the Board." (Exhibit 12, Memorandum of June 7, 2006, page 5). But that was exactly what the School Board did when it voted that the remaining books in the Series were to be replaced with a more "accurate set of books that is more representative of actual life in these countries." As noted, none of the other nineteen books in the Series were ever reviewed for accuracy by any requisite review committee or by the School Superintendent under the School Board's applicable rules. Nor did the SMRC or the DMRC consider whether their decision would impact all copies of the Cuba Books in all school libraries. The School Board patently ignored the legal advice of its own attorney as contained in the School Board Attorney's memorandum of June 7, 2006 to the School Board Members, which provided in applicable part:

> ... an issue raised by the DMRC, was whether the DMRC's decision impacted all copies of the book owned by the District. **The answer to this question is in the negative.** The DMRC merely reviewed the decision of the SMRC and the complaint of a parent from one school requesting that the book be removed from his child's school library. **There is no provision in the Rule for a district-wide removal of a school library book stemming from a DMRC review.** Although the Rule does not prohibit the Board from making a decision affecting the District as a whole, such District-wide impact would be more susceptible to legal challenge **because the Rule apparently contemplates independent school-by-school decisions regarding books.**

(Plaintiffs' Exhibit 12, Memorandum of June 7, 2005, page 5 n. 6) (emphasis added).

The official review process prior to the School Board's action focused on the accuracy of the Cuba Books and their educational suitability. While acknowledging the truth behind the concerns of members of the Cuban community, the essential issue debated by professionals and lay persons was whether a simple travel book for first and second graders was the proper place to discuss them, or put it another way, whether the omission of these concerns affected the educational suitability of the books. The vast majority of the professionals and lay people from throughout our community, as constituted on the SMRC and the DMRC, unequivocally said no. In their view, the Cuba Books were essentially apolitical, accurate and educationally suitable. I conclude that the greater weight of the more credible evidence, for preliminary injunction purposes, supports the educational suitability of the books.

The prior reviews of these committees were both thorough and extensive given

the publicity surrounding the issues involved. As stated in the Facts section, the SMRC, consisting of nine professionals and lay people, was appointed by the school principal to review the parent's complaint. Upon completing its review process pursuant to the School Board Rule, the SMRC voted 7 to 1 that the Book should remain a part of the school library's collection. (Plaintiffs' Exhibit 9). The parent appealed this decision. The Superintendent subsequently notified the Board of his intent to appoint a seventeen member committee (the DMRC), consisting of both professionals and lay people, as authorized by the School Board Rule. After several meetings, the DMRC[40] voted fifteen to one in favor of keeping the Cuba Books, which are part of a series of geography books written for 4–6 year old children. As noted in Plaintiffs' Exhibit 5, the DMRC considered the Books with special attention to five criteria: educational significance, appropriateness, accuracy, scope and special features. Much of the DMRC's dialogue centered on the issue of missing facts versus how much and what type of information is meant to be contained in books for very young children.

The importance of these recommendations was told to the School Board by its attorney. The School Board Attorney admonished the Board that "... it is important for the Board to carefully and thoughtfully consider the recommendations of the DMRC and Superintendent's recommendations." (Plaintiff's Exhibit 12, June 7, 2006 Memorandum, page 7). The School Board Attorney stated: "... it is our opinion that deviation from the DMRC's decision, *especially in light of the extensive analysis and deliberations by the DMRC,* would most likely subject the Board to legal challenge." (*Id.* at page 8) (emphasis added).

The opinions expressed by the SMRC and the DMRC were supported by professionals who testified on Plaintiffs' behalf at the preliminary injunction hearing. I find their testimony more persuasive and convincing than other opinions offered by the Defendants' witnesses. The concern of these professionals was that the objections to the Cuba Books appear to be based on adults attempting to import an adult value system into a children's book. With regard to the claimed omissions and inaccuracies, I find credible the opinion of Ms. Antoinette Dunbar, the Chair of the DMRC, who testified at the evidentiary hearing that: "We did not perceive those to be omissions relative to the developmental level of the text, nor the intent and purpose of this as a text for this age child."

The more reasoned and convincing opinion of Plaintiffs' experts is that too much information of the kind at issue is cognitively more damaging to young children than too little.[41] The professionals called

---

**40.** The members of the DMRC included a wide variety of professionals and lay people, including: the Regional Center Superintendent; the Principal of Lakeview Elementary School; the Principal of Coral Way K–8 Center; the Administrative Director of Instructional Technology, Instructional Materials, and Library Media Services; the Directors of Division of Social Sciences; the Instructional Supervisor of Language Arts; the Instructional Supervisor of Library and Media Services; a Reading Coach from Martin Luther King Elementary School; the Library Media Specialist from Phillis Wheatley Elementary School; the Library Media Specialist from Key Biscayne K–8 Center, a student from South Miami Senior High School; a designee from United Teachers of Dade; the President of the Dade County Council of Parent–Teacher/Parent–Teacher–Student Associations; a representative of the Florida House of Representatives; and the President of the Spanish American League Against Discrimination.

**41.** *Compare,* affidavit of Defendant's witness Lydia M. Usategui, M.D., stating that a problem with the Cuba Books "in this community" is that they "teach something that is dif-

by Plaintiffs testified that young children, the target audience of these books, would simply be unable to grasp the level of political thought implicit in Mr. Bolaños' documents. Several professionals concluded that such information would be detrimental to a child's understanding of the world at a very young age. In their view, including the kind of information advocated would make the books inappropriate for young children where the goal is simply to show a young child that other people in other cultures also eat, work and go to school like they do.[42] This idea and aspect of the Cuba Books was formulaic with the same outline and topics covered for each of the other nineteen other countries in the series. None of the Series Books exceeded thirty-two pages. It was neither the intent of the author nor publisher to discuss complex issues of government with respect to any of the countries. The Series Books, including the Cuba Books, were educationally suitable to show what people around the world share in common: they eat, sleep, go to school and play "like you." The emphasis was on things people share in common, not what divides and drives them apart.

In conclusion, it is the primary function of our schools to prepare their students for citizenship. Students will practice this "citizenship" in a country which prizes diversity and dissent. Hence, our schools must embody intellectual openness, lest they teach youth to discount important principles of our government as mere platitudes. The First Amendment ensures wide exposure to that robust exchange of ideas upon which the Nations' future depends. The School Board may not use its inherent power to expunge the expression of disfavored ideas.

### b. Plaintiffs' Fourteenth Amendment Due Process Claims

■ Plaintiffs argue that the Final Order violates their due process rights in two ways: first, by banning the Cuba Books in all libraries within the School District, and second, by banning all of the books in the Series despite the fact that no school had received a complaint about any book other than the Cuba Books.[43]

■ The Fourteenth Amendment proscribes states from depriving "any person of life, liberty, or property, without due process of law...." Procedural due process rights, which are protected by the Fourteenth Amendment, arise in the context of agency decision-making whenever an agency decides not to follow one of its own rules. *Government of Canal Zone v. Brooks*, 427 F.2d 346, 347 (5th Cir.1970)

---

ferent from what the children learn in their homes or from peers in their neighborhoods." The point appears to be that the schools should not have books on their library shelves which taint or cast a pall on such orthodoxy.

**42.** Another expert for Plaintiffs opined that: "(1) the alleged inaccuracies or distortions of the book are either of little consequence or are not properly inaccuracies but based on different interpretations of the Cuban historical and cultural reality; (2) the alleged omissions are appropriate omissions given the age level and purpose for which the book is intended, and (3) the objections and level of outrage expressed by many residents of the community over the books cannot be under-

stood by looking strictly at the inaccuracies and omissions, but rather must be understood within the broader ideological context of exile political culture that has a long history in Miami's Cuban exile community." (Plaintiffs' Exhibit 30).

**43.** In anticipation of the School Board's June 14, 2006 meeting, the School Board's own attorney cautioned that the matter arose following the DMRC and SMRC's review of a "complaint of a parent from one school requesting that the book be removed from his child's school library." (Plaintiffs' Exhibit 12) (emphasis added).

("It is equally well established that it is a denial of due process for any government agency to fail to follow its own regulations providing for procedural safeguards to persons involved in adjudicative processes before it," but denying infringement of due process where deviation from established rule did not prejudice the plaintiff's rights in an adjudicative proceeding); *Campos v. I.N.S.*, 32 F.Supp.2d 1337, 1348 (S.D.Fla. 1998); *Courts v. Econ. Opportunity Auth. for Savannah–Chatham County Area, Inc.*, 451 F.Supp. 587, 591 (S.D.Ga.1978). The School Board is an administrative agency pursuant to Chapter 120 of the Florida Statutes. Fla. Stat. 150.52 (defining agency to mean, *inter alia,* "board" or "educational unit," and "educational unit" includes local school districts); *L.B. Bryan & Co. v. Sch. Bd. of Broward County*, 746 So.2d 1194, 1196 (Fla. 1st DCA 1999) (describing Broward County School Board as an agency under Chapter 120, Florida Statutes). Defendants do not challenge any of these legal principles.[44]

Plaintiffs challenge the School Board's Final Order on the grounds that it ignores the requirements of the School Board Rule. The relevant portion of the School Board Rule, Section VIII, is entitled "Procedures for Consideration of Protests Concerning Instructional Materials and Educational Media." (Plaintiffs' Exhibit 6). It provides that, "[a]ny citizen may file a complaint with a school or the District concerning the use of particular curriculum materials, textbooks and ancillary items, library books, and nonprint media. **Challenged materials may be removed from use only after the following informal and formal due process procedures have been completed...."** (*Id.*) (emphasis added). The School Board Rule then goes

on for more than three pages detailing the book challenge process, which includes a number of stages. (*Id.*). The first stage is labeled "School Level–Informal Complaint." (*Id.*). This stage requires that the complainant meet with the school principal, who will either personally or through a designee explain the school's library selection procedures and the role of the challenged book in the library's collection. (*Id.*). If the complainant is not satisfied, he may proceed to the second stage, labeled "School Level–Formal Complaint." (*Id.*). That stage requires the principal to appoint a nine-member committee (the SMRC) to review the challenged book. (*Id.*). The complainant then has the option of proceeding to the third stage, "District Level–Formal Appeal," where the book will be reviewed by a seventeen-member committee (the DMRC) appointed by the Superintendent and chaired by the Deputy Superintendent of Education or a designee. (*Id.*). That committee transmits its decision to the Superintendent, who rules on the merit of the challenge. (*Id.*). The final step for the complaining party to take is to "appeal the decision of the Superintendent to the School Board in writing and [ ] request an appearance before the Board...." (*Id.*).

Plaintiffs' first alleged deprivation of due process occurred when the School Board removed the Cuba Books from every library in the School District even though the complaining parent's child attended Marjory Stoneman Douglas and there was no complaint by a parent with a child in any other school. This decision, Plaintiffs maintain, violates the School Board Rule's pronouncement that removal of challenged materials may only follow completion of the informal and formal grievance process

**44.** At the preliminary injunction hearing, counsel for Defendants' acknowledged the merit behind all of these legal principles.

outlined at length therein. Plaintiffs' second alleged deprivation stems from the School Board's decision to remove all books in the Series. This action violates the School Board's Rule, Plaintiffs contend, because apart from the Cuba Books, no other books in the Series were put through the administrative review process.

Defendants assert that the School Board did not violate any of its rules because there is no rule "prohibiting [the School Board] from ordering a district-wide removal of a book *or* ordering a district-wide removal of an entire series of books."

As I previously mentioned, the School Board's most recent position before this Court is directly contrary to the opinion of its own attorney, which was provided to the School Board in writing on June 7, 2006. (Plaintiffs' Exhibit 12). It is important to reiterate that same point in the due process context.

The School Board Attorney directly advised the School Board that the DMRC's decision **did not** impact all copies of the book owned by the School District. (Plaintiffs' Exhibit 12, n. 6). The School Board Attorney stated that there is no provision in the school Board Rule for a district-wide removal of a school library book stemming from a DMRC review. (*Id.*). Instead, the School Board Attorney stated that, "it is of vital importance that the procedures, established by Board Rule be followed **strictly. Suspending the applicable Board Rule would not be an available option to the Board.**" (*Id.* at p. 5) (emphasis added).

In a manner applicable to the legal issue here, the School Board Attorney stated, and I concur:

> The courts and Division of Administrative Hearings have held that agencies, including school boards, are required to follow and apply their own rules. *See, e.g., Fredericks v. School Bd. of Monroe County,* 307 So.2d 463 (Fla. 3d DCA 1975) ("As a public agency, the School Board is bound to fully comply with its own rules and policies."); *Vantage Healthcare Corporation v. Agency for Health Care Administration,* 687 So.2d 306, 307 (Fla. 1st DCA 1997) (an agency statement that does not follow its own rules *is itself an invalid rule* ); *St. Johns River Water Management District v. Modem Inc.,* Case Nos. 97–4389, 97–4390, 97–4391, 97–4392 and 97–4393 (DOAH 1999) (It is clear that "[a]n agency is not free to deviate from a valid existing rule....An agency must follow its own rules."). A change in the procedure that is currently set forth expressed in an adopted rule must be undertaken by rulemaking. *Cleveland Clinic Florida Hospital v. Agency for Health Care Administration,* 679 So.2d 1237, 1241 (Fla. 1st DCA 1996). For these reasons, we recommend that the Board not attempt to somehow suspend or waive its Board Rules.

(*Id.*) (internal footnote omitted).

Apart from deviating from the attorney's advice, the School Board's most recent position relies upon faulty logic. To begin, Defendants improperly characterize the focus of Plaintiffs' due process challenge by emphasizing the fact that the School Board Rule does not address the procedure for the School Board to use in evaluating a book challenge. Defendants miss the point. Plaintiffs challenge the fact that the School Board essentially rendered a ruling on two issues that did not work themselves through the administrative process, namely (1) the propriety of the Cuba Books in school libraries other than Marjory Stoneman Elementary School; and (2) the propriety of other books in the Series in all of the libraries within the School District. In order for me to find that the School Board has un-

fettered discretion to take any action it pleases because the School Board Rule does not say otherwise, I would be forced to ignore the exceptionally detailed review process that precedes the School Board's consideration of challenged materials. Such a conclusion is not only unsupported by legal authority, but completely illogical.

Defendants also emphasize the fact that one of the options the SRMC could consider in addressing the Cuba Books is removing it from "the total school environment." However, Defendants' review of the Cuba Book stemmed from one complaint raised by one parent at Marjory Stoneman Douglas Elementary School. Therefore, the School Board could only review removal of those books from that particular school.

The "total school environment" language is equally useless as a justification for the School Board's decision to remove the remaining books in the Series despite Defendants' argument that the Cuba Books are representative of the entire Series and it would defy logic to require a full analysis of each book before the Series can be removed district-wide. For one thing, the record does not establish that the School Board made any finding that the Cuba Books were representative of other books in the Series, assuming this were even a relevant fact-which it is not. It is clear from the record that the only body to review the other books in the Series at all was the DMRC, and as Mrs. Dunbar testified at length, that committee's review was limited to a comparison of those books with the Cuba Books to see whether all of the books in the Series featured structural similarities. Although the DMRC discussed whether the information presented in all of the books in the Series, including the Cuba books, was presented in a formulaic manner, the purpose of such a comparison was to further the DMRC's assessment of the Cuba Books only. Ms.

Dunbar testified that the DMRC was not responsible for determining whether books in the Series other than the Cuba Books should be removed from the School District. The DMRC was not charged with considering the appropriateness of other books in the Series, it did not make any recommendations regarding these other books, nor was it asked to make any such recommendations. Moreover, the record is clear that the School Board itself never reviewed the other books in the Series before removing them from all the schools in the School District.

Again, an interpretation of the School Board Rule in the manner desired by Defendants would require me to ignore the fundamental structure of the School Board Rule which encourages several stages of local review before the School Board may consider challenged materials. Indeed, followed to its eventual conclusion, the School Board's interpretation of the School Board Rule is that, anytime it considers a book to fall outside the parameters for inclusion in the school libraries, for any reason, it may suspend the book review process and ban the book district-wide.

The School Board Rule is unambiguous about the process that a parent can utilize to challenge a book in the child's school library. Even if that process is somewhat burdensome in requiring individual reviews at each of the schools in the School District, that is the rule established by the School Board and thus it must be followed. *Sheck*, 530 F.Supp. at 691 (in enjoining banning of library book, noting that "[a]dherence to established procedures is essential to prevent the kind of arbitrary action that is inherent in the violation by a governmental agency of its own rules."); *Salvail v. Nashua Bd. of Educ.*, 469 F.Supp. 1269, 1273 (D.N.H.1979) ("The Court finds and rules that, having adopted such 'interim guidelines', the Board was

required to follow them in its attempts at removal of MS magazine from the shelves of the high school library.").[45]

Finally, this is not an instance in which the School Board should employ its inherent ability to relax its own rules, as in *American Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970). The Court in *American Farm Lines* authorized the Interstate Commerce Commission to relax its rules regarding submission of certain paperwork before granting the appellant application for temporary operating authority given the urgency of facts surrounding the relief requested. *Id.* at 538–39, 90 S.Ct. at 1292. Importantly, in that case, the Court noted that the agency's decision did not cause prejudice to those wishing to object to that relief. *Id.* at 538, 90 S.Ct. at 1292. The facts of that case are distinguishable from those at issue here. Clearly, the School Board's decision to ban the Cuba Books and all other books in the Series in all schools without a review process caused extreme prejudice to those who might object to that removal. Parents with children at other elementary, middle, and high schools could not object to the removal of the Cuba Books, and no one had the opportunity to object to the removal of the entire Series from the School District. The facts of this case do not present the sort of technical grounds that sometimes condone an agency relaxing its own rules.

To summarize, Plaintiffs have demonstrated that they are likely to succeed on the merits of their First and Fourteenth Amendment claims against Defendants.

Therefore, I will now turn to the remaining elements required for entry of injunctive relief.

### 2. Irreparable Harm

 I begin my consideration of this element with due regard for the fact that, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976); *Calvary Chapel Church, Inc. v. Broward County,* 299 F.Supp.2d 1295, 1305 (S.D.Fla.2003); *CBS Inc. v. Smith,* 681 F.Supp. 794, 805 (S.D.Fla.1988) ("This Circuit has held that the loss of First Amendment rights, even for a brief period, causes irreparable harm") (citing *Cate v. Oldham,* 707 F.2d 1176, 1188 (11th Cir.1983)); *Deerfield Med. Ctr. v. City of Deerfield Beach,* 661 F.2d 328, 338 (5th Cir.1981); *Northeastern Florida Chapter of Ass'n of Gen. Contractors v. City of Jacksonville,* 896 F.2d 1283, 1285–86 (11th Cir.1990) (distinguishing the *Cate* and *Deerfield* opinions as cases where, given the 'intangible nature' of the violations alleged therein, monetary damages were insufficient compensation).

In *Sheck v. Baileyville Sch. Comm.,* 530 F.Supp. 679, 684 (D.Me.1982), the court held that the removal of a book from the school library for reasons of objectionable language posed an irreparable threat to students' rights under the First and Fourteenth Amendments. Such threat meant that the students were likely to suffer irreparable injury before a decision on the merits could be reached, thereby satisfying

---

**45.** I note that *Case v. Unified Sch. Dist. No. 223* stands for the proposition that a school board's failure to follow its own rules in a book removal case does not amount to a violation of due process. 908 F.Supp. 864, 876 (D.Kan.1995). This proposition directly contravenes the authority in this Circuit that an agency must follow its own rules in order to avoid infringing due process rights. *See Brooks, Campos,* and *Courts, supra.* As I mentioned earlier, I decline to apply the reasoning in *Case* to Plaintiffs' procedural due process claims.

the first requirement for a preliminary injunction. *Id.*

Plaintiffs argue that if the School Board's Final Order is allowed to stand, then students returning to school on August 14, 2006 will not have access to the Cuba Books and other books in the Series. In fact, students currently attending summer school cannot check out any of the Series Books because the School Board has removed them from all elementary, middle, and high schools in the School District. Plaintiffs insist that the removal of the Series Books from the school libraries, making them unavailable to students currently enrolled in summer school, and to those students who return to school on August 14, 2006, constitutes irreparable harm. I agree. Until the School Board's Final Order is addressed, students browsing in the school libraries will not be able to locate, read, and/or check out the Series Books from their school libraries at their leisure. This is harm of an irreparable nature because it cannot be remedied by money damages. To summarize, the ongoing interferences with Plaintiffs' constitutional rights amount to irreparable harm.

Defendants respond that there is no threat of irreparable harm to Plaintiffs because Plaintiffs have no First Amendment "right of access" to the Cuba Books, the government can constitutionally restrict access to information under its purview, the removal was protected "Government Speech," the Cuba Books lack "educational suitability," and the School Board's decision related to the valid pedagogical concern of preventing the dissemination of misleading information in children's books. All of these issues have been considered, and rejected, in my analysis on likelihood of success on the merits. Plaintiffs adequately state a fear of irreparable harm to their constitutional rights. This element is satisfied.

### 3. Balance of Harms

Plaintiffs also state that the irreparable harm they face is greater than the harm that would follow if injunctive relief were entered. This element is often compared against the likelihood of success on the merits to the extent that if the harm facing the plaintiff is extremely significant, then the plaintiff has an easier burden to demonstrate likely success. *Canal Auth. of State of Fla. v. Callaway,* 489 F.2d 567, 576 (5th Cir.1974). In this case, there is no need to devote much time to the issue because Defendants merely state that, given their reasons that irreparable harm to Plaintiffs is lacking, the harm they face through entry of injunctive relief (presumably, interference with "government speech," a position I rejected above) satisfies this element in full. As explained above, Plaintiffs currently suffer, will continue to suffer irreparable harm to their constitutionally-guaranteed rights, and I find that that harm outweighs any supposed threat of injury to Defendants. The Cuba Books have been in libraries within the School District since 2001. Keeping them there pending a full decision on the merits poses no readily obvious harm to Defendants' interests, let alone a harm that rises to the level of infringement of constitutional rights. Since Defendants fail to present any similarly important right at stake on the balance of harms question, I conclude that the balance weighs heavily in Plaintiffs' favor. *Sheck,* 530 F.Supp. at 684 (declaring that the balance of harms favored the parent who challenged removal of the objectionable book in light of the fact that the defendants identified "no qualitatively-comparable right of their own which would be adversely affected by restoring [the book] to the library pending a decision on the merits.").

4. Public Interest

■ The final hurdle for Plaintiffs to overcome before injunctive relief follows is that the public interest will not be harmed through entry of an injunction. Clearly, my initial consideration of whether Plaintiffs' constitutional rights are to be continually infringed is not adverse to the public interest. *American Civil Liberties Union of Georgia v. Miller,* 977 F.Supp. 1228, 1235 (N.D.Ga.1997) ("'[n]o long string of citations is necessary to find that the public interest weighs in favor of having access to a free flow of constitutionally protected speech'") (quoting *American Civil Liberties Union v. Reno,* 929 F.Supp. 824, 851 (E.D.Pa.1996)). Indeed, such action serves a number of fundamental purposes for which this Court conducts its business. It is a forum to address the significant and competing public policies at issue. *Sheck,* 530 F.Supp. at 693. It safeguards against continued and potentially broadened infringement of individual liberties. *Id.* It defines the limitations that government may put on one of the most unique and important sources of First Amendment rights for children, school libraries. *Pico,* 457 U.S. at 868, 102 S.Ct. at 2809.

Defendants state only that the public interest is disserved by this Court's meddling with the affairs of a local school board. "Clearly, the public interest would not be served by having a federal court decide whether geography books have so many inaccuracies, misleading statements, and omissions that they should be removed from the school libraries." (Defendants' Response to Plaintiffs' Supplemental Memorandum on Certain Preliminary Injunction Elements, p. 9). I disagree. Protecting fundamental constitutional rights is not judicial "meddling." Rather, it is the sworn obligation of this Court to preserve and protect those rights from abridgement.

Accordingly, for all of the reasons stated above, it is hereby **ORDERED AND ADJUDGED:**

1. Plaintiffs' Motion for A Preliminary Injunction (converted from Emergency Motion for Temporary Restraining Order) [DE 17] is **GRANTED.**

2. Defendants are **ENJOINED** from enforcing the terms of the School Board's Final Order entered June 14, 2006. Defendants are **ORDERED** to immediately replace the Cuba Books, as well as all other books in the Series, on the library shelves in the schools identified in Plaintiffs' Exhibit 44.

3. Defendants shall file a notice of their compliance with the terms of this Order **on or before July 24, 2006.**

4. Defendants' Motion to Dismiss the Complaint is **DENIED AS MOOT** [DE 31] given the filing of the First Amended Complaint.

5. The parties shall comply with any further orders of this Court establishing procedures and setting a date for a final hearing in this matter.